IN THE MATTER OF THE ESTATE OF WILLIAM TITTERING-
TON, deceased.

**Estates of decedents:** DISTRIBUTION OF PERSONALITY. The personal
1   estate of a decedent will be distributed according to the law of
his domicile, irrespective of the place of administration.

**Change of domicile:** EVIDENCE. Intention to change the place of
2   domicile, coupled with actual residence in the new location will
effect a change, even though there may be an indefinite inten-
tion of returning at some future time. Evidence held to show
a change of domicile from Illinois to Iowa prior to the death
of deceased.

*Appeal from Palo Alto District Court.*— HON. A. D.
BAILIE, Judge.

THURSDAY, APRIL 5, 1906.

THE opinion states the case.— *Reversed.*

*Soper, Morse & Soper, Wilson & Grilk,* and *Ellis &
Ellis,* for appellants.

*Lane & Waterman,* and *E. A. Morling,* for appellees.

SHERWIN, J.— William Titterington died intestate in
the hospital for the insane at Independence, Iowa, in No-
vember, 1900, and this is a contest to determine who suc-
ceeds to his personal estate. The deceased was never mar-
ried. He had no issue, nor any brothers or sisters, and
neither of his parents survived him. After the death of
Titterington, William Braithwaite of Davenport, Iowa, a
maternal uncle, filed a petition in probate in the Palo Alto
district court in which he alleged that he was the sole heir
of William Titterington, and as such heir was entitled to
his entire estate. Administrators were duly appointed by

said court, and they proceeded to settle the estate.   But before distribution thereof was made, and before the heirship was determined, the children of a brother and of a sister of said William Braithwaite, and the decendants of a brother and of a sister of Thomas Titterington, the father of the deceased, William Titterington, appeared and filed their petition alleging their several interests in the estate.   Thereafter testimony was taken showing the relationship of these claimants, and a trial was had in December, 1903, which resulted in a decree agreed upon by all of the parties.   This decree awarded William Braithwaite one-sixth of the entire estate, and the other claimants the remaining five-sixths thereof.   The decree was filed in the clerk's office on the day after it was signed by the judge, and left there for immediate recording.   Before it was recorded, however, and on the 14th of March, 1904, William Braithwaite filed a petition asking that it be modified and set aside, and that he be awarded all of the personal estate of the deceased, on the ground that the deceased at the time of his death was domiciled in Illinois, and that under the statutes of distribution of that state, he was next of kin and entitled to all of the property.   Issue was joined on this petition, and a trial had in equity, resulting in a judgment finding that at the time of his death, and for many years prior thereto, William Titterington was a citizen of the state of Illinois, and domiciled therein, and that all of his personal estate should be distributed according to the laws of the state of Illinois.   The decree of December, 1903, was modified, and it was adjudged that William Braithwaite was the sole next of kin, under the Illinois statute, and that he was entitled to the entire personal estate of William Titterington.   The other claimants appeal.

There is no question but what the personal estate of the deceased must be distributed according to the law of his domicile, irrespective of the place of administration, and it is undisputed that William Braithwaite was the next of kin under

the statutes of Illinois. There remains then, but two ques-

1. Estates of
Decedents:
distribution of
personalty.
tions — one, the right of Braithwaite to have
the decree of December, 1903, modified; and
the other, the domicile of Titterington at the
time of his death. The first of these two questions we shall
disregard, because we prefer to dispose of the case on its
merits, and our conclusion on the facts renders its consider-
ation unnecessary.

The second is one of law and of fact. That Tittering-
ton was domiciled at Wyanet, Ill., for many years prior to
August, 1891, is undisputed. That he left Wyanet in the

2. Change of
domicile:
evidence.
same month, and came to Iowa, where he con-
tinuously and without ever returning to Wy-
anet, actually resided until his death in 1900,
is also undisputed. And here we may say that in discussing
this case we shall use the word " residence " to indicate the
place of dwelling, whether permanent or temporary, and
the word " domicile " to indicate the real home of the de-
ceased. A few general rules may also be noticed in this
connection. A man must have a domicile somewhere. He
cannot have two at the same time and a domicile once gained
remains until a new one is acquired. Two things must con-
cur to effect a change of domicile. There must be actual
residence and the intent. *Tuttle v. Wood,* 115 Iowa, 507;
*Cohen v. Daniels,* 25 Iowa, 88; *Vanderpoel v. O'Hanlon et
al.,* 53 Iowa, 246. Mere intention cannot effect the change,
but the intention to remain, coupled with the act of actual
residence, establishes the domicile, notwithstanding a floating
intention to return at some future time. *Church v. Cross-
man,* 49 Iowa, 444; *State v. Groome,* 10 Iowa, 308. And
this intention need not be to remain for a definite time.
" A change of domicile does not depend so much upon the
intention to remain in the new place for a definite or in-
definite period as upon the fact that it is without a definite
intention to return; and even an intention to return at a re-
mote or indefinite period may be controlled by other cir-

cumstances establishing the fact of domicile in the new place." *Johnson v. Smith,* 43 Mo. 499; Paine on Elections, section 47; McCrary on Elections, section 105.

During all of the time involved Titterington owned a farm near Wyanet, one in Palo Alto county, Iowa, and a part of the time, at least, one in Minnesota. He bought the Iowa farm in 1885. His Illinois farm was well improved, well stocked, and rented. When residing at Wyanet, he occupied a suite of rooms which were well furnished, and when he came to Iowa in August, 1891, he left these rooms, with their furnishings, in charge of an old chum, who occupied them for some time thereafter, and when he left them they were closed, and so remained until the death of Titterington. When he came to Iowa, he left with his banker at Wyanet a locked box containing a considerable amount of valuable securities, retaining the key thereto himself. Before coming to Iowa he had secured plans for a house which he intended to build on his Palo Alto county farm, and which he did in fact erect in 1892. He was a great lover of hunting dogs, and brought with him to this state several finely bred ones, with the avowed purpose of keeping them where they would be unmolested by unfriendly people and where he could use them in the field. His Iowa farm was rented, and already had buildings fairly comfortable and sufficient for the tenant, yet he carried out his plan, and erected a large and expensive dwelling house thereon, using the very best of material, and building it in the strongest and most substantial way. It was built some sixty rods from the public road, away from all the other buildings, the grove, and the well, and his purpose in so locating it was to have a quiet and safe place for his dogs. As we have said, Titterington was never married. His mother died near Wyanet, in 1866, and was buried at Davenport, Iowa, where the petitioner, Braithwaite, lived. When he came to Iowa in August, 1891, he left no relatives in Illinois, and so far as the record discloses he had no interests there, other than

the property interests which we have already stated. He reserved rooms in the new house in Palo Alto county for himself and his dogs, and there he lived with his tenant until the summer of 1897, when he was adjudged insane and committed to the hospital at Independence, Iowa. . In the meantime he never returned to Wyanet, although he was in Chicago once, at least, during the time; nor did he visit his relatives in Davenport.

On the 14th of November, 1891, and again on the 8th of March, 1892, he drew a check on the Bank of Wyanet, using blank checks which had been furnished by the Wyanet Bank, and which had thereon, below the signature, the printed words, " Wyanet, Illinois." On the 5th of March, 1892, he also issued a stud dog certificate, which gave his residence as Wyanet. Again, in 1895, he executed a release of a mortgage on property near Wyanet, and stated therein that he was a citizen of Illinois. These four transactions and the letters written by him, which we shall presently notice, are his only written declarations on the question of domicile. As we have seen, he still retained property at Wyanet, he had collections made there which went into the bank, and it is not strange, or very significant, that he should use the blank checks that we have mentioned. As to the stud certificate, the record fairly shows that he brought the dog from Wyanet to Iowa, and the inference is that he was registered. Hence it would be quite natural to identify him as he did. Titterington's Iowa farm was eight or ten miles from Emmetsburg, and the release of which we have spoken was presented for his signature and acknowledgment by his Illinois banker in person, who was a notary for that state. Titterington objected to going to town, and to having an officer come to him, and suggested that he could acknowledge before the Illinois man, which was accordingly done. The written declarations on which the appellees most rely are contained in three or four letters written by the deceased, in 1892. In one of December 15, 1892, he says: " Will

be home soon.   Write often and tell me all the news."   In another written in November of the same year he says: " I hope to see you before long.   I desire to go South this winter."   In a letter to his banker at Wyanet, relative to certain notes, he says: " I will return same as soon as I get home."   In a letter to a friend in Wyanet, written January 15, 1892, he asks what they are going to do with a factory building there, and inquires: " would it make a good dog kennel?   I want some place to keep my dogs when I come back.   Please find out what they ask for it."   In another letter, written to his friend in Wyanet, it is said: " I long for rest, and long to get back where I can be easy with my dogs.   I shall try to make my home in the South, if I find a place to suit me."   These expressions, even if detached from the rest of the writing, bear the marks of chance statements, showing nothing more than a feeling of unrest, and they are not to our minds at all conclusive on the question of intention as to domicile.   This is apparent from other letters written by deceased during practically the same period.   Thus in September, 1891, he wrote to one of his cousins in Davenport, and in the letter said: " On the back of this sheet I sketch a plan of my house as it will be when finished.   I think, when done, I shall live up here."   In several letters he refers to his house, and says it will be " a fine one, the best farm house in the county," and " As soon as I get my new house up, will go South and look me up a winter home.   I do not wish to winter in the Northwest any more."   In May, 1892, he wrote to his particular friend in Wyanet, the one who had charge of his rooms there: " I am going South next winter.   I would not stop up here for a fortune.   This is no place for me or the dogs in the winter.   Too cold, but not any more so than Illinois."   Before leaving Wyanet in the fall of 1891, deceased verbally declared to several persons that he was coming to Iowa to improve his farm and to make it his permanent home, and from the time of his arrival here, until 1896, he declared, to a score or

more of his acquaintances and friends that his home was in fact here.

The appellees contend that the testimony of witnesses as to oral declarations made years before is weak and unsatisfactory evidence, and wholly insufficient to overcome the legal presumption that the domicile remained in Illinois. That such evidence may be entirely unsatisfactory is true, but it is not to be so regarded in all cases. When it bears the marks of truthfulness and reliability, and is supported as it is in this case, by the fact of residence for a long period, it is valuable and should be given weight. . Actual residence for a long period of time is, and should be strong evidence of the intention to make the place of such residence the domicile, and when the fact is accompanied by other acts, and by declarations entirely consistent therewith, it is all but conclusive. Another act supports our conclusion. It is shown that the deceased voted for a director at one of the school elections. This is, of course, not conclusive; but it is everywhere recognized as a valuable circumstance in determining the question of domicile.

It is contended that the mental condition of Titterington after 1892 was such that he was incapable of establishing a. domicile for himself; but with this contention we cannot agree. The evidence fails to show a serious .mental weakness prior to 1896, and that he possessed intelligence enough to acquire a domicile up to that time we do not doubt. Leaving his rooms and property in Wyanct is not at ·all conclusive. *Remey v. Board,* 80 Iowa, 470. Moreover, in 1895, he gave the key of his tin box to his Wyanet banker, and instructed him to look after his securities.' In this hurried review of the evidence, we have not attempted to recite all thereof supporting the claims of the parties. It has been our purpose to call attention only to the more prominent items. We have given the entire record the most careful consideration, however, and are abidingly convinced that the trial court erred

in finding that the domicile of Titterington was in Illinois. The judgment is therefore reversed, and the case remanded for a decree in harmony with this opinion.— *Reversed* and *remanded.*