MARIA FARROW, Appellant, v. MOSES FARROW, Appellee.

**Domicile:** TEMPORARY RESIDENCE. One may have a temporary domicile away from home without necessarily acquiring a residence at that place; thus he may temporarily reside at different places and yet

have but one domicile or residence to which he intends at some
future time to return.

**Limitation of actions:** NON-RESIDENCE: BURDEN OF PROOF: EVI-
2 DENCE. When a negotiable instrument is barred on its face, the
party seeking to avoid the statute on the ground of absence of the
maker from the state, has the burden of proving that the maker
had gained an actual residence outside of the state, and had resided
there for the requisite length of time. The evidence in this case is
insufficient to show that defendant, who resided here when the note
in suit was executed, had acquired an actual residence in a foreign
state.

**Domicile:** CHANGE: EVIDENCE. A domicile once gained continues
3 until a new one is acquired, mere intent is not in itself suf-
ficient to effect a change; there must also be an actual physical
change in location with intent not to return to the old residence.
Change of domicile may be shown, however, by circumstantial as
well as by direct evidence.

*Appeal from Hardin District Court.*—HON. C. G. LEE, Judge.

WEDNESDAY, NOVEMBER 12, 1913.

ACTION on a promissory note. Defense, Statute of Limi-
tations. Reply, Defendant had been out of the state and a
non-resident so as to avoid the running of the statute. *Affirmed.*

*Lundy, Wood & Baskerville,* for appellant.

*G. W. Ward,* for appellee.

GAYNOR, J.—This is an action at law on a promissory
note for $596.20, dated November 6, 1875, and due one year
after date, with interest at the rate of ten per cent. per an-
num. The note was made by one Moses Farrow to one Abigail
Peterson, the mother of the plaintiff, and indorsed to plaintiff
July 3, 1880, with an indorsement of payment thereon of
$200 September 23, 1878.

The defendant admitted the execution of the note and,
as a defense thereto, pleaded the following: First. That the

cause of action sued on did not accrue at any time within ten years next preceding the commencement of the action, and that the same is barred by the statute of limitations. Second. That the note had been fully paid. Third. That the money, for which the note was given, was borrowed of the mother of the plaintiff for the purpose of investing in lands for the benefit of the plaintiff, with the understanding that the note would not have to be repaid to the payee therein named but would be part of the share of the plaintiff in her mother's estate. That the money borrowed, and for which the note was given, was invested in lands, and the title to the same taken in the name of the plaintiff. Fourth. That the plaintiff is estopped from maintaining this action because of her laches in holding the note from the year 1880 to the time of bringing the action without informing the defendant that she held the same uncanceled or that she made any claim against him on that account, while she, in the meantime, was getting him to pay her some of the money and to transfer his interest in all his property to her or for her benefit. Upon the issues thus tendered, the cause was tried to the court without a jury. Judgment being entered for the defendant dismissing plaintiff's petition, plaintiff appeals.

There is no evidence to support the second and third defenses interposed by the defendant; and, unless the court was justified in finding, under the evidence, the note was barred, by the statute of limitations, this cause should be reversed. All the testimony bearing on this question was given by the defendant.

It appears from the evidence submitted that in 1875 the plaintiff and defendant were husband and wife and lived in Eldora, Hardin county. In 1879 it appears that the family relations were not pleasant, and the defendant left Eldora. At the time he left, he had his wife and six children; the oldest of said children being fifteen years of age and the youngest less than two years old. He visited the family at Eldora a few times during the first five years after he left, and subse-

quent to that time, and up to 1900 he visited the family at Eldora a dozen or twenty times. When he was back in the winter of 1879 or 1880, he stayed a couple of weeks, and then went back to Mitchell, S. D., where he stayed until December, 1880. At the time this action was commenced, he was living in Davidson county, S. D., about seven miles south of Mitchell. It appears that, within two or three months after he went out to South Dakota, he entered the timber claim that he now occupies but did not live on this claim for fifteen or twenty years. When he first went to Dakota, he engaged in the grocery business, freighting groceries from Yankton and Sioux Falls and other places before there was any railroad to Mitchell; that he then went into the grocery business with a partner and was engaged in that business for two or three years. In the summer of 1880 he went to Devils Lake, N. D., and worked for wages, but was not engaged in any business there. After that he returned to Mitchell and boarded. He was elected road supervisor in South Dakota about fifteen or twenty years ago. This was before he commenced to live upon his land. Part of the second year after he went out to South Dakota he was with a party of surveyors. When he was at Mitchell running a grocery store, he slept in the store and boarded at different restaurants. He testifies:

My residence in South Dakota has been either out of town, in Mitchell, or Lisbon township, where the tree claim is situated, or in the township of Beulah, right west of Mitchell, or in Mt. Vernon township, directly west of Beulah. Part of the time I was in one township in the southwestern part of the county. I worked at farm work and I worked at different places. My headquarters were at the timber claim. I cannot tell, within four or five years, the time when I lived in Beulah. It was about twenty years ago. I was not living on a place of my own. I stayed with a man by the name of West. Part of the time my headquarters were at Mitchell. I had a room there. I stopped at a hotel three or four years, putting in timber claims. Since I left Eldora, except two years I was at Devils Lake, I have traveled all over the United States. I had my residence at Mitchell as soon as I arrived,

after I left the state of Iowa.   After leaving in 1879, and up
to and as late as 1892, I never formed any intention of
remaining away from Iowa permanently.   My intention was
to return.   I owned a homestead in Eldora when I went away.
I had a wife and six children who were home at the time.
After I left Eldora, up to and prior to 1892, I contributed
to the support of my family at Eldora.   After I came back
to South Dakota from North Dakota, I went all over the
United States to make some money.   I don't think I had a
permanent residence at Mitchell, or a legal residence in South
Dakota, or in any other place aside from here in Eldora.   I
stayed at the old home, and the plaintiff was there.   Always
stayed there when I was here.   Did not have any other home
or residence, other than my home at Eldora, from 1879 to
1892.   My object in going away was to make some money.
When prospects in South Dakota were not very good, I had
some intention of going back onto the farm before she sold
out.   My family relations were not pleasant when I went
away, and as to whether I would come back to live with the
plaintiff depended on how the family relations would be when
I came back.   When I came back, I didn't stay.   The family
relations were still unpleasant.   I understood when I went
away I was in duty bound to support the children, and the
groceries I sent were for that purpose.   I sent $200 to build
a barn on the plaintiff's place.   I sent the draft to my oldest
daughter for that purpose.   I had no fixed and positive
intention of staying away from home or returning.   I in-
tended to go where I wanted to and do as I wanted to as
circumstances might, from time to time, lead me to think it
was right.   I never knew that Mrs. Farrow did not intend
to live with me longer until she applied for a divorce about
two years ago.   I never stayed long in Eldora any of the
times I returned.   (He further testified:)   I don't think I
voted in South Dakota, but I would not say positively.   I
served on a jury about ten years ago.   I think I served on
a jury twice.   That was a long time ago.   I was a judge or
clerk of election a good many times in the last ten years.   I
paid poll tax until I got over age, except a whole lot of times
I was gone and escaped in that way.   I paid a poll tax during
the time I was engaged in business in Mitchell in 1879, 1880,
and 1881.   When I left I didn't know how soon I was coming
back.   I went away to make money.   I didn't know how soon
I would make my pile.   I didn't know whether I would come

back at all or not. The idea was to go out and try to better my circumstances, and then I would do as I pleased about coming back. I have carried out the intention from the time I left here never to come back to the home at Eldora to live, but I never formed any intention of remaining away permanently.

The plaintiff testified that she had the note in question when the defendant visited here in the summer of 1880; that she had the note when he was there in 1881. Had it at all times when he came until the present time. ''I knew he was here at all times because he stayed at my house, or the house that I lived in.''

It is apparent from this record that, prior to the time defendant left Hardin county, he had not only a residence but a domicile in the county; that he possessed a homestead in which he resided with his wife and children; that when he left his wife and children remained on the homestead. He left his home and went West because of domestic infelicity, the character of which is not disclosed in the evidence. He claims he did not find the home pleasant then; that he left with no definite purpose in his mind of remaining away or returning; that he frequently returned after leaving, as we infer, for the purpose of ascertaining whether or not there would be any changed relationships in the home life and with the purpose of remaining if the conditions had changed; that at each visit he found the conditions were unaltered; that he left each time, as he says, with no definite purpose of either remaining away or returning. That he did return at frequent intervals, the evidence discloses, from twelve to twenty times, and remained a few days each time with his family in the home. Prior to 1892 the evidence does not show that he had a fixed domicile in any place outside the state of Iowa; that he had a purpose in his mind of permanently remaining in either of the Dakotas or at any other point to which in his travels he may have gone.

A person may be temporarily domiciled without acquir-

ing a residence at any point. A man does not acquire a residence by remaining at any particular place away from his home. In one sense a man is residing wherever he may happen to be. He is there living, moving, and having his being, but the term "residence," as used in the statute, is in a narrower sense than that.

1. DOMICILE: temporary residence.

A residence simply for the purpose of carrying on business, for the sake of making money, or for health or pleasure may be temporary. In *Love v. Cherry*, 24 Iowa, 204, it is said: "Books are all agreed that a person may have several residences, even though but one domicile." That is, he may temporarily reside at many places and have one domicile or residence to which he intends, at some future time, to return.

Defendant's residence and domicile had been in Iowa up to 1879, and hence the burden was upon the plaintiff to show that he had acquired a new residence or domicile outside the state of Iowa, and was a resident outside the state of Iowa for at least ten years prior to the commencement of the action.

2. LIMITATION OF ACTIONS: non-residence: burden of proof: evidence.

The note, on its face, is barred by the statute of limitations. Therefore the burden rests upon the plaintiff to show the fact contended for which takes it outside the statute of limitations; and, to establish this, it was incumbent on the plaintiff to show, not only that the defendant was living outside the state of Iowa for that length of time prior to the commencement, but in view of the fact that he had a domicile and residence, at the time the note was given, in Iowa to show that he had acquired an actual residence outside the state of Iowa, and to establish this two things must concur: First. That he actually resided outside the state. Second. That he had no intention to return to his home in Iowa.

From all that appears in this record, he may have been tentatively remaining outside the state because of domestic infelicity, with the intent or purpose in his mind of returning

to his home whenever conditions became such that he could do so. Indeed, reading between the lines of this old man's testimony, it is not difficult to infer that his visits to his home, during the years of his absence, were for the purpose of ascertaining whether or not the objectionable features in his home life had been so modified that he could return and live with his family.

The evidence in this case is not clear and satisfactory. The evidence touching his residence outside of Iowa is neither definite nor certain as to time or place. The mind cannot reach a satisfying conclusion as to the manner or character of his life there or the nature or extent of his residence at any particular place. The evidence is vague and indefinite as to the times he returned, as to the length of time he remained at each return, as to the purpose of his returning, as to the intent with which he returned to Iowa, or the nature or character of the property, or business, or habitation to which he returned after his visits here.

3. DOMICILE: change: evidence. It must be borne in mind, in the consideration of this case, that a residence or domicile once gained remains until a new one is in fact acquired.

A mere intent to change is not alone sufficient. There must be an actual physical change of location, coupled with the intent not to return to the old established home, before the new residence can be said to have been acquired.

This may be shown by facts and circumstances, as well as by direct testimony.

In *Langdon v. Doud*, reported in 6 Allen, 423 (83 Am. Dec. 641), the Supreme Court of Massachusetts, passing on a question similar to this, said:

Absence from the state of itself is clearly not sufficient to suspend the operation of the statute. The provision is explicit that the time of a debtor's absence shall be deducted from the time limited for the commencement of the action only in case 'he is absent from and resides out of the state.'

The contention, therefore, concerning the interpretation of the statute resolves itself into a question as to the true meaning of the word 'residence.' Of this there is no room for any serious doubt. It certainly does not signify a temporary sojourn or occasional abode. In legal phraseology it is synonymous with habitancy or domicile. This is the sense in which it is used in statutes. By Gen. Stats. (Mass.) c. 3, section 7, it is enacted that the word 'inhabitant' may be construed to mean 'resident.' And by the Constitution of Massachusetts, chapter 1, section 2, art. 2, it is provided that the word 'inhabitant' shall be held to signify that a person 'dwelleth or hath his home' in a particular place. Nor are we able to see any good or sufficient reason for attributing to the language of the statute, creating an exception to the statute of limitations, any new or unusual signification. A residence out of the state, as applied to the subject-matter, may well mean the acquisition of a domicile without its limits. So long as a debtor has a last and usual place of abode in the commonwealth (that is, while he retains his domicile or residence here), the courts of the state have jurisdiction over him, and due service of legal process can be made upon him. A creditor can at any time commence a suit to enforce a claim against a debtor domiciled within the state. A writ can be served by leaving a summons at his last and usual place of abode, and, in case of his absence from the state, actual notice of the pendency of the action can be given to him, so that a valid and binding judgment can be obtained. In such case the creditor has ample opportunity to prevent the operation of the statute bar. But it would be otherwise where the debtor had no domicile within the state. No valid service of process could be made upon him, and the courts could have no jurisdiction over his person. The true construction, therefore, of this clause of the statute would seem to be this: That where a defendant, against whom a cause of action accrues, is a resident within the state, and continues to reside therein, his occasional and temporary absences, however long continued, if not of such a character as to change his domicile, are not to be deducted in computing the statutory term fixed for the limitation of an action. Such is the weight of authority in those states where an exception to the statute of limitations exists, similar in its phraseology to our own statute on the subject. *Hackett v. Kendall,* 23 Vt. 275; *Hall v. Nasmith,* 28 Vt. 791; *Ford v. Babcock,* 4 N. Y. Super. Ct. 518; *Wheeler*

*v. Webster,* 1 E. D. Smith [N. Y.] 1; *Harden v. Palmer,* 2 E.
D. Smith [N. Y.] 172; *Drew v. Drew,* 37 Me. 389; *Gilman v.
Cutts,* 27 N. H. 348.   It may be added that this construction
of the statute seems to be the only one which will afford a
fixed, permanent, and certain rule by which to ascertain
whether a particular case is included within or excluded from
the operation of the exception to the statute.   If residence is
not held to signify domicile, it can have, as applied to the
subject-matter, no definite and ascertained meaning; but it
would be necessary to vary its interpretation in each particu-
lar case, according to the circumstances proved concerning
the length of the absence of the debtor from the state and
the objects for which he went away.   There would be no
standard by which to determine whether he could claim the
benefit of the statute bar or was excluded from the operation
of the exception.

This holding is not inconsistent with the holding of this
court in the case of *Schlawig v. De Peyster,* reported in 83
Iowa, 323.   The court, in passing upon the sufficiency of sub-
stituted service to confer a jurisdiction, said: ''In this case
there was a fixed and constant purpose to remove the plain-
tiff's family to the Black Hills, which was all the time re-
garded by him as the permanent place of residence and home
of the plaintiff.   This purpose was never relinquished or
changed, and there is no evidence showing facts in conflict
therewith.''

The court distinguishes this *Schlawig* case from the case
of *Love v. Cherry,* reported in 24 Iowa, 204, because in the
*Cherry* case there was an absence of intention to make the
residence in Texas permanent, and because of the continual
purpose to return to the prior place of residence, and in the
*Cherry* case it was held that substituted service, made at the
prior place of residence in Iowa on a member of the family,
was sufficient service to confer jurisdiction.

It must be borne in mind that this is a law action; that
the finding of the lower court has the force and effect of the
verdict of a jury.   Upon the whole record, we cannot say that

the court erred finding for the defendant upon the issues tendered, and the judgment is therefore *Affirmed.*

Weaver, C. J., and Deemer and Withrow, JJ., concur.