IN RE ESTATE OF J. M. COLBURN.

NATHAN O. COLBURN et al., Appellees, v. E. H. ADDISON, Administrator, et al., Appellants.

**DESCENT AND DISTRIBUTION: Nature and Course in General—**
**1** Conflict of Laws—Personal Property under Law of Domicile. In the absence of a, statute to the contrary, personal property of the decedent is subject to the law of descent of the state of decedent's domicile at the time of his death, and not to the laws of the state in which such personal property is located.

**DESCENT AND DISTRIBUTION: Nature and Course in General—**
**2** Corporate Stock. In the distribution of a decedent's estate, shares of corporate stock are personal property, although they may represent an interest in either personal property or real estate.

**DOMICILE: Establishment — Intention and Residence Necessary.**
**3** To establish a domicile at any particular place, there must be an intention to do so and the fact thereof; and the mere intention, without, in fact, residing or abiding, cannot constitute a domicile.

**DOMICILE: Establishment—Evidence.** Evidence reviewed, and
**4** held to support a finding that decedent, at the time of his death, was domiciled in the state of Iowa.

**DOMICILE: Establishment—Evidence.** That a resident of Iowa
**5** had made several loans to residents of Oklahoma, and was the president and director of a bank in Oklahoma, does not make his domicile in the state of Oklahoma, under Sec. 4665, Revised Laws of Oklahoma, 1910, providing that the domicile of a person conducting a business by agent, through an office, or otherwise transacting business within that state, shall be held to be in that state.

**DESCENT AND DISTRIBUTION:** Nature and Course in General—
6  Conflict of Laws—"Business Situs." Whenever the money of
a lender 'in one state is, by the principal, entrusted to the
custody of an agent in another state, for the purpose of being
kept in the latter state, and l̶o̶a̶n̶e̶d̶ ̶o̶u̶t̶, collected, and reloaned,
or habitually kept on deposit for safety merely, so as thus to
remain long enough to become localized as a part of a whole
mass of personal property in the latter state, such money
acquires what is known as a "business situs," and may, for
the purpose of descent, taxation, and the like, be governed by
the statutes of the state of such situs.

**EXECUTORS AND ADMINISTRATORS:** Actions—Costs—Contest
7  among Heirs. Where a contest as to the shares of heirs of
decedent's estate is between the heirs, and in no sense against
the administrator in his official capacity, the expenses incurred
by such parties in such litigation should not be shouldered onto
the estate; and an order of the court that attorneys' fees in
such litigation should not be paid out of the estate was proper.

*Appeal from Story District Court.*—R. M. WRIGHT, Judge.

JULY 1, 1919.

SUIT to determine the shares of the estate of J. M. Colburn, deceased, to which plaintiffs and defendants are each entitled, resulted in a decree declaring each of the former entitled to one fourth, and each of the latter to one twelfth thereof. The defendants appeal.—*Affirmed.*

· *Dale & Harvison,* for appellants.

*Dillard & Blake, C. G. Lee, I. R. Meltzer,* and *T. G. Garfield,* for appellees.

LADD, C. J.—I. J. M. Colburn died intestate, at the age of 75 years, February 11, 1915. He had never married. E. H. Addison was duly appointed and qualified as administrator of his estate. Decedent was the son of Orlin Colburn, Sr., and Balsora Miller Colburn, both of whom departed this life prior to his death, and left them surviving another son, Orlin Colburn, Jr., by them begotten, and a

daughter of Orlin Colburn, Sr., and Pauline Cole Colburn. The children of Orlin Colburn, Jr., who died before decedent, Nathan O. Colburn, Edward B. Colburn, and Mildred A. Darley, filed an application, asking that the court determine the shares to which each of the different heirs is entitled, and praying that each of plaintiffs be adjudged to be entitled to one fourth of the estate. The half-sister of decedent, Catherine Addison, also had departed this life, and left as her only children and heirs, Ella D. Sherwood, Edwin H. Addison (the administrator), and George W. Addison, and they, by way of answer and cross-petition, join in the prayer that the shares in the estate to which each is entitled be adjudicated.

For convenience, we shall refer to the heirs of the brother as plaintiffs, and the heirs of the half-sister as defendants. The former say that decedent's domicile, at the time of his death, was in Story County, while the latter insist that his domicile was then in Oklahoma. If his domicile was in Story County, his estate, save as interfered with by the laws of Oklahoma, passed under Section 3381 of the Code; and plaintiffs, children of the full brother of decedent, each took one third of three fourths, or one fourth thereof, and each of defendants, children of the half-sister, inherited one third of the remaining one fourth, or one twelfth. On the other hand, if decedent is found to have been domiciled in Oklahoma at the time of his death, the children of the brother of the full blood and those of the sister of the half blood inherited equally, and each would take one sixth of the estate. Section 8427 of the Revised Laws of Oklahoma.

The only realty left by decedent was 80 acres of land in Oklahoma, and that passed to the heirs under the laws of that state. Section 6595, Revised Laws of Oklahoma.

Only personalty remains. In the absence
of a statute to the contrary, it is subject to
the law of the owner's domicile, with respect to its disposition *inter vivos,* and also
as to transmission by last testament, or by
succession upon death of the owner, intestate. To determine who is entitled to succeed to such property as heirs of the owner, resort is had to
the laws of the state in which the owner had his domicile
at the time of his death, rather than to the laws of the
locality in which such personalty happened to be located.
*Caruth v. Caruth,* 128 Iowa 121 ; *In re Estate of Tittering-
ton,* 130 Iowa 356. By a fiction of the law, it is presumed
to attend the person of its owner, and to be present in that
state in which he has his domicile. *Gilbertson v. Oliver,*
129 Iowa 568; *Klumpert v. Vrieland,* 142 Iowa 434; *Wil-
kins v. Ellett,* 9 Wall. 740 (19 L. Ed. 586), 108 U. S. 256
(27 L. Ed. 718) ; *In re Estate of Ingram,* 78 Cal. 586 (12
Am. St. 80, with note at page 90). The rule and the rea-
son for it were well stated in *Desebats v. Berquier,* 1 Binney
(Pa.) 336 (2 Am. Dec. 448). See *Cornelison v. Blackweld-
er,* 38 Okla. 1 (131 Pac. 701) :

"It must be considered as settled that 'the succession to
the personal estate of an intestate is to be regulated ac-
cording to the law of the country of which he was a domi-
ciled inhabitant at the time of his death.' If this is the rule
in case of intestacy, why should not the same rule prevail
with respect to last wills? It is only with the view to pro-
mote the general convenience and happiness of mankind
that any country allows the laws of a foreign nation to oper-
ate in any instance on property within its territory. *It is
supposed that every man is best acquainted with the law of
his own country, and that, when he dies intestate, it is his
desire and expectation that his personal property, wher-
ever situated, should be distributed according to that law;*

1. DESCENT AND
DISTRIBUTION :
nature and
course in gen-
eral : conflict
of laws : per-
sonal property
under law of
domicile.

*and to gratify this reasonable desire, it is the practice of civilized nations to extend their courtesy toward each other so far as to permit the law of the domicile of intestate to prevail.*"

Shares of corporate stock are personal property. No one would regard it as realty, and hence it necessarily falls under the other head, of personalty, though it may represent an interest in either. *Morrow v. Gould,* 145 Iowa 1.

2. DESCENT AND DISTRIBUTION: nature and course in general: corporate stock.

As was said in *Judy v. Beckwith,* 137 Iowa 24: .

"While corporate shares possess some peculiar qualities and characteristics, we think that none have ever been discovered which take them out of the class ordinarily termed 'personal property.' * * * If he dies intestate, their distribution to his heirs is governed by the law of his domicile, and not by the law of the corporate domicile."

See *In re Estate of Miller,* 90 Kan. 819 (136 Pac. 255), where the court held that:

"The situs of shares of capital stock in a Kansas corporation owned by one who was a resident of another state at the time of his death, for purposes of administration, is at the domicile of the decedent, rather than in the state in which the corporation is organized and has its place of business."

*Frothingham v. Shaw,* 175 Mass. 59 (78 Am. St. 475); *McKeen v. County of Northampton,* 49 Pa. St. 519 (88 Am. Dec. 515).

No statute of Oklahoma to the contrary has been called to our attention, and Section 6738 of the Revised Statutes of that state expressly declares that:

"If there is no law to the contrary in the place where personal property is situated, it is deemed to follow the

person of its owner, and is governed by the law of his domicile."

This is in harmony with the rule universally recognized, that personalty must be distributed according to the law of the domicile, and this must govern in the distribution of this estate. See *In re Estate of Titterington,* 130 Iowa 356. The parties are agreed that:

3. DOMICILE: establishment: intention and residence necessary.

"Domicile is that place where a man has his true, fixed, and permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning."

The decedent had made his home with a tenant on his farm in Washington Township, Polk County, for more than 20 years, and he was there domiciled up to March 1, 1913. He then left the farm, which he had sold; and the issue to be determined is whether thereafter he established his permanent residence in Maxwell, Story County, or at Collinsville, Oklahoma. The evidence that he went from the farm to the hotel in Maxwell, where he stayed part of the time, was at a hotel in Des Moines several days, and went to Oklahoma in April or May, and returned about six weeks later, is undisputed. While gone, he was at the home of Nathan O. Colburn in Collinsville, Oklahoma, about two weeks, without paying for board or lodging; visited Edward B. Colburn at Owassa several days; visited his brother at Eureka, Kansas, and possibly friends and relatives elsewhere. Upon his return to Maxwell, he lived at the hotel for a while, and about the middle of August, 1913, moved into rooms in the house of one Shoop. He had spoken to the latter about leasing the rooms in the spring, and Shoop had promised them as soon as vacated. This oral lease was for no definite period, though decedent paid rental for the rooms in advance as long as he lived. Shoop testified that decedent told him "he was going to stay there until he died,

if he would let him have the place;" and that he procured
a housekeeper, about January 1, 1914, and kept her in his
employment until his death. During the summer of 1913,
he visited his nephew at Nevada, for a short time, but,
other than recited, appears to have remained at Maxwell
during that year and 1914, except in October, when he again
went to Collinsville, Oklahoma. He met his nephew, Ed-
win H. Addison, and wife at Kansas City, Missouri, from
where, after visiting another nephew, they proceeded to Col-
linsville. This arrangement, according to Edwin H. Addi-
son, was made in view of the fact that he "intended or
thought he might stay there permanently at that time."

Shoop says decedent was gone about three weeks; that
his housekeeper stayed at his rooms about a week and then
visited her daughter the remaining two weeks, and re-
turned on the same day decedent reached Maxwell again;
and that the latter had left a package of papers with
Shoop's wife for safe-keeping. About November 1, 1914, he
visited a few days with his nephew and family at Nevada.
It should be added that he purchased an automobile at
Maxwell in 1913, and was sued in Polk County by one Rea-
gan for a commission alleged to have been earned in the
sale of his farm, and on his claim that he was a resident
of Story County, the petition was dismissed; but at the
same time, he "was claiming that he intended to go to Okla-
homa and stay." Though he had been accustomed to keep
his papers in a large envelope on his person, while at
Shoop's home he procured an iron automobile box, with a
lock, in which he kept them thereafter, save when he went
to Oklahoma.

Nathan O. Colburn, who resided at Collinsville, Okla-
homa, was with decedent on his farm in Polk County short-
ly before decedent left it, and testified that the latter had
said that "he thought he would go to Maxwell," but "didn't
say how long he was going to stay there;" that he did not

recall that decedent talked about going to Oklahoma; that, when he came to Oklahoma, he stopped at his (witness') home about two weeks, and was with Edwin R. Colburn at Owassa several days; that they talked about where he was going to live from that time on, and decedent said he didn't know, but "thought he would stay right in Maxwell; that he felt at home there in Maxwell," but "might spend his winters in a warmer climate;" that the winters in Iowa "were too cold and wet;" that, upon leaving Collinsville, he "went to his brother's place at Eureka, Kansas, and remained a week or ten days;" that he told witness that his doctor had advised him "to leave Iowa because of the rigors of the climate;" that the witness had asked him "to come to Oklahoma to live and make his home" there; that, upon witness and his wife's visiting him when sick, in the spring of 1914, he had "invited him to come back home with us and stay a while, thinking perhaps it would be beneficial to him;" and that there was no talk "about building a house in Collinsville for him, or remodeling our house so as to suit his convenience;" that the witness and his wife had invited decedent to come down to Collinsville, and said that "we would make it pleasant for him in every way," and, "if he liked to make his home there, we would be glad to let him make his home there;" and that he said he could not stand the tax rates in Oklahoma.

"Q. Did it occur to you that his business—his money—transferred there would be subject to taxation?  A. Yes."

The witness also recited that, in August, 1914, he had a conversation, when at Maxwell, with decedent concerning where he would live, and again invited him "to come down there to Oklahoma and stay a part of the time, if he did not choose to stay all the time," and to "make his home there;" that, when decedent was there in October, 1914, he remained at the witness' house over two weeks, and boarded with him without compensation; and the wit-

ness then said to him that "it would be better for him to
live in a milder climate," and suggested that he "spend the
winter with us," to which decedent responded, "No, he
wanted to come back home." It appears that decedent was
president of the State Bank of Maxwell, where he had, at
the time of his death, a checking account of $5,725.57. He
was also a stockholder and president of the First National
Bank of Collinsville, Oklahoma, and had there a checking
account of $540, and another account in that bank known
as the "Farm Account."

Mrs. Carter, a daughter of the administrator's, swore
that, immediately after the funeral of decedent, Nathan O.
Colburn and his wife, Edward B. Colburn, and George W.
Addison went to the house of her father, and while there,
Mrs. Nathan O. Colburn said that "they had been putting
off building until they knew what Uncle Jim wanted to do,
and went on to tell about this room that they had; that
their home was fine for him; that this room was near the
bathroom; and they all, and even the children, called it
Uncle Jim's room; and he knew when he came that he
had a place to stay;" that she "spoke about putting off
building until Uncle Jim came down to approve the plans;"
and further, that they were putting off building "until they
would know what he wanted." This was not directly con-
troverted; but Nathan O. Colburn testified that there was
no room at his home set apart for decedent; that, when
he came, the room usually occupied by Colburn and his
wife was turned over to decedent, and they slept elsewhere.
It appears, also, that decedent was a member of the Masonic
Lodge at Maxwell, and continued such until his death, and
that this lodge officiated at his funeral.

The decedent, in leaving his farm, as might be expect-
ed, went to the place where probably he was best acquaint-
ed, and where he had done his trading for years; and, as
we think, after visiting relatives, he established his

permanent abiding place in the rooms leased of Shoop. He continued there from the middle of August, 1913, until his death, in April, 1915, save when away temporarily, visiting his nephew in Nevada or the one in Collinsville. Until January 1, 1914, he cared for the rooms and cooked for himself, but thereafter, had a housekeeper always, except two weeks while he was absent in Oklahoma.

He claimed Story County as his place of residence when sued by Reagan, even though he said "he was going to Oklahoma to stay," and referred to Maxwell as home, in his talk with Colburn; and to that place he appears always, when away, to have intended to return. He voted there in the fall of 1914; and, though not conclusive, this was indicative, in the absence of explanation, that he deemed himself a permanent, rather than temporary, resident of that place. See *Robinson v. Charleton*, 104 Iowa 296. Undoubtedly, there was talk of establishing as his place of residence the home of his nephew in Collinsville, but the record is void of evidence that he ever reached a definite purpose so to do, or ever so did. The declarations of Mrs. Colburn, testified to by Mrs. Carter, indicate plainly that he had not expressed to her a purpose of making his home in Collinsville, and the administrator goes no further than to say that he claimed he was going there to stay, and that, in making his last visit to Collinsville, "he intended or thought he might stay there permanently at that time." But it is not pretended by the witness that he had determined so to do, and at the very time that he is said to have claimed that he was going to Oklahoma to stay, he was claiming Story County as his place of residence. We are unable to find from the evidence that decedent had ever fully determined to make any place in Oklahoma his home. He stayed at Collinsville but two weeks, on his visit in 1913, and was back at Maxwell in two weeks in 1914. He had been at Collinsville once or twice, previous to these trips,

but at no time made any arrangement for a place in which to reside. If he carried all the papers with him, he merely followed his habit, prior to finding the iron box from an automobile. Little or no significance is to be attached to the loaning or depositing of money in Oklahoma; for this is not indicative of making his home there, nor inconsistent with residing in Maxwell. He purchased a residence in neither place; and, although he went to Collinsville about a month after leaving the farm, and possibly with an intention to stay, he was there but a couple of weeks, and then proceeded to visit other relatives. If he ever negotiated for a home or actually established a residence or entered into any arrangement for a home, this record is silent on the subject. Everything he did was consistent with the thought that he was making a visit. During his stay, he was merely a guest in the home of his nephew. Though invited to make his home there, he is not shown to have accepted, nor to have done so.

To establish a domicile at any particular place, two things must concur: (1) The intention so to do; and (2) the fact. There must be the intention to make the location one's permanent abiding place, and then there must be the fact of actually there residing. As said by Wright, J., in *Hinds v. Hinds,* 1 Iowa 36:

"The mere intent, without the fact of residence or abiding, cannot constitute the domicile. Neither can the intent, without having the abode, the home, the place to dwell, constitute residence."

See *State v. Savre,* 129 Iowa 122, 123. Even though decedent may have, at times, intended to live permanently in Collinsville, he is not shown ever to have resided there other than temporarily, as a guest; whereas he had an established place of residence in Maxwell after August, 1913. To his place of residence in Maxwell he returned always;

4. DOMICILE: establishment: evidence.

and this, with his designation of Maxwell as home, warrants the conclusion that it was so intended. We are persuaded that the domicile of decedent, at the time of his demise, was in Story County. See, as bearing hereon, *Farrow v. Farrow*, 162 Iowa 87; *In re Estate of Titterington*, 130 Iowa 356.

Having reached the conclusion that the evidence is insufficient to warrant a finding that decedent ever became a resident of Oklahoma, it is unnecessary to determine upon whom the burden of proof rested; but see *Will of Olson*, 63 Iowa 145, 146. We are content with the finding of the district court that decedent was domiciled in Iowa at the time of his death.

II. Appellants also contend that, under a statute of Oklahoma, decedent is to be regarded as domiciled there. It appears in the Revised Statutes of that state:

5. DOMICILE: establishment: evidence.

"Sec. 4665. The domicile of every person, firm, or corporation conducting a business in person, by agent, through an office, or otherwise transacting business within the state of Oklahoma, and which has complied with or may comply with the Constitution and laws of the state of Oklahoma, shall be for all purposes deemed and held to be the state of Oklahoma."

If this were applicable, it might be that personal property in Oklahoma would have to be distributed as though decedent actually had domiciled there; but he had never conducted a business there, in person or by agent. As president and director of the bank at Collinsville, he was one of its agents for the transaction of its business. The corporation was doing its own business as a distinct entity, through him and others as agents, and in no sense acting for him. The same is true of his relation as director of the American National Bank of Muskogee, Oklahoma. The domicile of the bank was there, but not necessarily that of

those who acted for it. Nor was he engaged in transacting a business within the state by an agent or through an office or otherwise. By a "business," in its legal and com-mercial sense, is meant that in which one engages for the purposes of a livelihood, profit, or the like. As said in *Beickler v. Guenther,* 121 Iowa 419:

"'To engage in business' is uniformly construed as signifying to follow that employment or occupation.which occupies the time, attention, and labor, for the purpose of a livelihood or profit."

Webster defines "business" as:

"That which engages the time, attention, or labor of anyone as his principal concern or interest, whether for a longer or shorter time; constant employment; regular occupation."

See *Territory of Montana v. Harris,* 8 Mont. 140 (19 Pac. 286).

Business is also defined as "that which busies or occupies one's time, attention, and labor as his chief concern; that which one does for a livelihood; occupation; employment; as, his business was that of a merchant; to carry on the business of agriculture." *Waggener v. Haskell,* 89 Tex. 435 (35 S. W. 711). See *Goddard v. Chaffee,* 84 Mass. 395 (79 Am. Dec. 796); *Cuzner v. California Club,* 155 Cal. 303 (100 Pac. 868); *Easterbrook v. Hebrew Ladies Orphan Society,* 85 Conn. 289 (41 L. R. A. [N. S.] 615); *Ammons v. Brunswick-B-C. Co.,* 72 C. C. A. 614; 6 Cyc. 259, and cases collected. So, too, the word "business" implies an employment or occupation that is continuing. *Parkhurst v. Brock,* 72 Vt. 355 (47 Atl. 1068).

It is apparent from these definitions that, even though decedent had loaned his nephew, Nathan O. Colburn, $15,-000, and one Ward $2,000, in 1912, and $1,500, subsequent thereto, doing so did not amount to conducting a business in Oklahoma. This nephew acted for him in making the loans

to Ward, and the notes of the latter were in his possession at the time of decedent's death. So far as appears, these loans to Ward are the only transactions of the kind there, and these two alone cannot be regarded as being "otherwise transacting business," as we interpret the statute quoted. The notes of Ward do not appear to have been left at Collinsville for other purpose than safe-keeping. There is no showing that they were retained for reinvestment, or were taken or retained in connection with a business of loaning money on security or otherwise. "Business," as found in the above phrase, has reference to a business such as we have undertaken to define, and not to one, or even several, isolated transactions in any line.

What is contemplated by this statute was fixing the domicile of every person, copartnership, and corporation having what may be designated a *"business situs"* in the state. An occasional loan of money, with or

6. DESCENT AND DISTRIBUTION: nature and course in general: conflict of laws: "business situs."

without security, is not deemed sufficient to create such situs. Whenever the money of a lender in one state is, by the principal, entrusted to the custody of an agent in another state, for the purpose of being kept in the latter state, and loaned out, collected, and reloaned, or habitually kept on deposit, for safety merely, so as thus to remain, through the course of dealing, so long as to become localized as a part of a whole mass of personal property in the latter state, such money acquires what is known as a *"business situs,"* and may, for the purpose of descent, taxation, and the like, be governed in these respects by the statutes of the state of such situs. *In re Estate of Romaine,* 127 N. Y. 80 (12 L. R. A. 401) ; *Adams v. Colonial & U. S. Mtg. Co.,* 82 Miss. 263 (100 Am. St. 633; 17 L. R. A. [N. S.] 138).

As previously remarked, personal property has no locality, but ordinarily is subject to the law of the owner's

domicile; and the manifest purpose of this statute, in fixing the domicile of persons engaging in business in Oklahoma, was to govern the transfer or descent of personal property made use of therein, by the laws of that state.

The facts in the case of *Commissioners of Johnson County v. Hewitt*, 76 Kan. 816 (93 Pac. 181, 14 L. R. A. [N. S.] 493), were much like those in this case, and there the court said:

"It is not necessary to determine precisely what facts will be sufficient in every case to establish an independent business situs for notes and mortgages; but, generally, the element of separation from the domicile of the owner, and fairly permanent attachment to some foreign locality, should appear, together with some business use of them, or some power of managing, controlling, or dealing with them in a business way. A merely transitory presence in a foreign state, or a naked custody for safe-keeping, is not enough."

See, also, *Hunter v. Board of Supervisors*, 33 Iowa 376; *Buck v. Beach*, 206 U. S. 392 (51 L. Ed. 1106).

Enough has been said to indicate our view that decedent had no business domicile in Oklahoma, and the proceeds of these notes are not to be distributed under the laws of that state. It should be added, however, that the Supreme Court of the United States, in *Harrison v. St. Louis & S. F. R. Co.*, 232 U. S. 318 (58 L. Ed. 621), in declaring unconstitutional the two sections following that quoted, seems to have thought all three inimical to the Federal Constitution. Section 4666 of the Revised Laws of Oklahoma declares that:

"The license or charter to do business within the state of Oklahoma of every person, firm or corporation conducting a business in person, by agent, through an office or otherwise transacting business within said state of Oklahoma, who shall claim or declare in writing before any court of

law or equity within said state of Oklahoma, domicile within another state or foreign country, shall, upon such declaration, be immediately revoked."

The next section makes it the duty of the judge of any court before whom any claim to foreign domicile is made, within the contemplation of the previous section, to make report at once of the fact to the secretary of state, and transmit to that office a copy of the claim. Another section exacts that the secretary of state receipt for the copy mentioned, and declare the license or charter of any person, firm, or corporation "so filing said claim or declaration forfeited and revoked." In disposing of the case, Chief Justice White said that:

"While the provisions of the statute are dependent one upon the other, and are unified in the sense that they all are components of a common purpose,—that is, tend to the realization of one and the same legislative intent,—its provisions, nevertheless, for the purpose of analysis, are plainly twofold in character: that is, one, the compulsory citizenship and domicile within the state which the first section imposes, and the other, the prohibition which the statute pronounces against any assertion in a court of the existence of any other citizenship and domicile than that which the statute ordains, and the means and penalties provided for sanctioning such prohibition. Although, theoretically, the first would seem to be the more primary and fundamental of the two, since the second, after all, consists but of methods provided for making the first operative, the second, from the point of view we are examining, is the primal consideration, since it directly deals with the assertion in a state court of a right to remove, and provides the mechanism which was deemed to be effectual to render the assertion of such right impossible. In other words, the difference between its two provisions is that which exists between an attempt on the one hand to render the

enjoyment of a Federal right impossible, by arbitrarily creating a fictitious legal status incompatible with the existence of the right, and on the other hand, the formulation of such prohibitions and the establishment of such penalties against the attempt to avail of the Federal right as to cause it to be impossible to assert it. Coming, then, to consider the statute from the second or latter point of view, we think it is clear that it plainly and obviously for-. bids a resort to the Federal courts on the ground of diversity of citizenship in the contingency contemplated, punishes by extraordinary penalties any assertion of a right to remove under the laws of the United States, and attempts to divest the Federal courts of their power to determine, if issue arises on the subject, whether there is a right to remove. * * * The contention so much insisted upon, that the act should not be declared unconstitutional because it does not discriminate, we assume refers to the provision of the statute creating an arbitrary standard of state citizenship and domicile, but, as we see no possibility of separating that provision from the unconstitutional attempt to prevent access to the courts of the United States, there is no occasion to further deal with the subject of discrimination."

Notwithstanding this last suggestion, it is possible that, conceding the invalidity of Sections 4666 and 4667 of the Revised Laws, the courts of Oklahoma may regard Section 4665 thereof as not necessarily so connected with the subsequent sections as to be carried down with them. That statute may be upheld as valid for the purposes of taxation and casting the descent of property, even though not available to defeat the jurisdiction of the Federal courts. Because of this situation, we prefer to rest our decision on the finding as made.

III. The court directed that the costs be paid by the administrator out of the funds of the estate, but that this

should not include attorneys' fees, and that each party should "pay for the services of his own or her own attorney." Appellants contend that the entry relating to attorneys' fees was not within the issues. The controversy was between heirs and concerning their respective interests in the estate. The administrator was a party, and "prayed for all such other, further, and additional relief and instructions as to the court may seem meet." That he should not pay for the services of the attorneys employed by the parties was appropriate matter for instructions, and clearly within the prayer of the answer. The administrator, as such, was indifferent between the parties. It was a matter of indifference to him, in so far as the estate was concerned, what the shares of each should be adjudged to be. The contest was between the heirs, and in no sense against the administrator in his official capacity. In such a case, the expenses incurred by the parties should not be shouldered onto the estate. *In re Estate of Berry*, 154 Iowa 301; *In re Estate of Smith*, 165 Iowa 614. What we have said disposes of all points raised in the briefs, and the judgment is—*Affirmed*.

7. EXECUTORS AND ADMINISTRATORS: actions: costs: contest among heirs.

GAYNOR, PRESTON, and STEVENS, JJ., concur.