**In the Matter of the ESTATE of Edward J. ALLEN, a/k/a E. J. Allen, Deceased.**

**Appeal of Ruby ALLEN.**

**No. 2–57169.**

Supreme Court of Iowa.

Feb. 18, 1976.

Baird, Bowers & Oliver, Des Moines, for appellant, Ruby Glover Allen.

Michael F. Travis, Bedford, and Richard L. Wilson, Lenox, for appellee, Edward J. Allen Estate.

Heard before MOORE, C. J., and MASON, LeGRAND, HARRIS, and McCORMICK, JJ.

HARRIS, Justice.

This appeal challenges the trial court's ruling on objections to the final report in an ancillary estate. Decedent's widow and her attorney are co-administrators. Their final report was attacked on various grounds by decedent's mother and sister. Decedent's mother appeals from rulings favorable to the widow. We affirm in part, reverse in part and remand with instructions.

The decedent Edward Allen died intestate May 12, 1972, a resident of Hopkins, Missouri. He was survived by his widow Phyllis Allen (Phyllis) of Hopkins, Missouri, his mother—the appellant—Ruby Allen (Ruby), of Gravity, Iowa, and his sister Lucille Miller (Lucille) of Red Oak, Iowa. Resident estate proceedings took place in Missouri. The final report was approved there April 6, 1973.

The Iowa ancillary estate was opened May 25, 1972. The final report of the co-administrators was filed April 11, 1973. In response to written objections by Ruby and Lucille it was amended. Ruby and Lucille also objected to the final report in its final form. Ruby's appeal from the trial court's order overruling the objections presents five propositions. The first three have to do with disposition of property in which decedent had once held partnership interests. A fourth proposition challenges disposition of funds deposited by Phyllis in an Iowa bank and which were derived from the sale of personal property located in Missouri. Ruby's final challenge is to the granting in Iowa of a surviving spouse's allowance.

■ We explained the scope of our review of objections to a final report in *In re Estate of Roehlke*, 231 N.W.2d 26, 27 (Iowa 1975). The hearing on objections is an equitable proceeding under § 633.33, The Code. Our review is de novo. We give deference to but are not bound by the trial court's findings.

I. Beginning January 2, 1966 decedent and H. A. McCoy operated a cattle business in partnership. Because the parties considered the question to be of controlling importance they dispute whether the partnership was terminated prior to decedent's death. Ruby believes decedent and McCoy had merely moved toward termination. Phyllis argues the partnership had been actually terminated.

Between December 7, 1965 and December 3, 1968 decedent and McCoy acquired 1123

acres of land situated in Worth County, Missouri and Ringgold County, Iowa. The land was purchased in five different parcels for use in the cattle operation. Title to the Iowa land was conveyed as "an undivided one-half interest to Edward J. Allen and Phyllis Allen, Husband and Wife as Joint Tenants with Full Rights of Survivorship, and not as Tenants in common; an undivided one-half interest to H. A. McCoy and Wylma McCoy, Husband and Wife."

The title to four Missouri parcels all indicated each couple was to receive an undivided one-half interest in the land. Two mentioned the Allen's undivided one-half interest was to be held in tenancy by the entirety; the other two merely indicated "Edward J. Allen and Phyllis Allen, husband and wife."

The 1123 acres of land were sold on contract April 15, 1972. The contract, prepared an Official Form 21.2 of the Iowa State Bar Association, contained a provision continuing any joint tenancy of the vendors in their contractual interest notwithstanding execution of the contract.

Ruby contends the land was a partnership asset and that the principal and interest payments received upon sales remained partnership property. She asserts decedent's one-half interest should be included in the estate to pass by intestate succession. In support of her contention Ruby sets out ten indicia in an attempt to establish the land had been, and continued to be, held in partnership until sold on contract. She lists such factors as source of purchase price, use of the property by McCoy and decedent, and the fact the land transaction appeared on their partnership tax returns. From this basis Ruby argues a familiar partnership principle in the mistaken belief it will inure to her benefit. The principle was stated at 12 Drake L.Rev. 131, 135–136 (1963). We quoted it with approval in *Lamp v. Lempfert*, 259 Iowa 902, 908, 146 N.W.2d 241, 245 (1966):

" * * * In determining what is partnership property, consideration is most strongly given to the source of the funds from which the property is acquired. It has been held in numerous cases that where property is purchased through partnership funds, even though title is taken in the name of one partner alone, the property is that of the partnership. Other consideration has been given to the general surrounding circumstances regarding the situation of the parties, the manner of keeping the accounts, how the repairs, improvements and taxes have been paid, and what has been done with the income, the use made thereof, and the like. (Authorities)."

Phyllis argues the partnership was in fact terminated prior to the sale of the land. The issue of partnership termination was hotly disputed at trial and on appeal. We need not and will not pass on this issue because we consider the issue inappropriate.

▆▆▆ In the first place termination of the partnership would not necessarily work an automatic division of assets. Even though a partnership is terminated its assets, though held in other than the partnership name, are generally subject to a resulting trust. *Gregory v. Gregory*, 248 Iowa 672, 674–675, 82 N.W.2d 144, 146 (1957); *Lutz v. Billick*, 172 Iowa 543, 547, 154 N.W. 884, 885 (1915) and authorities.

▆▆▆ We believe the answer to Ruby's contention lies in the purpose of the rule upon which she relies. We perceive that purpose to be to protect and preserve the true nature and extent of ownership in partnership assets. In this regard the intent of the parties is paramount. 60 Am. Jur.2d, Partnership, § 92, pp. 21–22. Because the purpose of the rule is to protect the actualities of ownership the rule presuming partnership ownership does not apply to situations where the parties intend otherwise. 60 Am.Jur.2d, Partnership, § 94, pp. 23–24; 68 C.J.S. Partnership § 72d, pp. 508–511. The rule was well stated in *Gertz v. Fontecchio*, 331 Mich. 165, 170–171, 49 N.W.2d 121, 124 (1951):

" * * * Property acquired with partnership funds or by the partners individually for the use of the partnership does not necessarily constitute a partnership asset. In the absence of supervening rights of creditors, such property may, as between the partners, at least, be owned by them individually as tenants in common or otherwise, as distinguished from the partnership, if such was their intention in the acquisition and holding thereof. (Authorities) * *."

The rule, under the Uniform Partnership Act, is now codified in Iowa by § 544.8(2), The Code, which provides: *"Unless the contrary intention appears*, property acquired with partnership funds is partnership property."* (Emphasis added.)

■ We think evidence in this case compels a conclusion the parties intended otherwise. It appears in the titles to the various parcels. In each parcel title included the wife of each partner. Each couple held an undivided one-half interest as tenants in common with the other couple. Decedent and Phyllis held their interest in joint tenancy with right of survivorship. It is manifest the parties carefully thought out and provided for the nature of their ownership in the parcels. The trial court was correct in determining the land was not a partnership asset. Ruby's first contention is antithetical to the clear intention of the parties and is without merit.

II. Decedent was also involved in another partnership. Together with Ralph Tamerius he conducted a general farming and cattle raising operation on a farm in Taylor County, Iowa. Three hundred of the 380 acres which comprised the farm had been purchased by decedent and Phyllis on March 6, 1967. A Missouri bank was designated as escrow agent in the contract and was directed as follows:

"Sellers have this date executed warranty deed conveying this farm to buyers. This deed is deposited with escrow agent. When total purchase price is paid in full escrow agent is directed to deliver deed to buyers.

In event of breach or forfeiture by buyers and sellers exercise of option to forfeit by reason thereof as hereinafter set out, escrow agent to return deed to sellers, in which event all amounts paid on contract by buyers shall be considered as rent and liquidated damages and contract shall be terminated."

In the contract the purchasers were merely identified as "Edward J. Allen and Phyllis Allen, husband and wife." In the warranty deed, which the contract recites was executed at the same time, the grantees were designated as "Edward J. Allen and Phyllis Allen, husband and wife, as joint tenants, and not as tenants in common." At the time of decedent's death $13,750 of the $37,500 original purchase price remained unpaid.

■ Ruby relies on the presumption we explained in *In re Estate of Miller*, 248 Iowa 19, 79 N.W.2d 315 (1956). Under our holding in *Miller* a presumption arises whenever realty is conveyed to two or more persons as grantees that they take as tenants in common and not as joint tenants. Ruby argues we should look to the real estate contract and ignore the undelivered deed, citing *Randolph v. West*, 158 N.W.2d 722 (Iowa 1968). She also urges the deed which was in escrow was executed only by the vendors and does not show what the grantees intended their interest to be.

We however agree with trial court that the presumption in favor of tenancy in common was overcome in this case. The controlling question again is the intent of the parties. Section 557.15, The Code, states: "Conveyances to two or more in their own right create a tenancy in common, *unless a contrary intent is expressed.*" (Emphasis added.) We believe it is proper to look to the warranty deed, not because it was effective as a conveyance while in escrow, but in order to profit from whatever light it may cast upon our determination of that intent. In *Miller*, 248 Iowa at 21, 79 N.W.2d at 317, we said " * * * [a]ny language which clearly shows an intent to

make the grantees in a written instrument of conveyance or ownership joint tenants is sufficient. * * *."

We believe Ruby's reliance on *Randolph v. West,* supra, is misplaced. In that opinion we emphasized:

"There is no evidence that *at the time the contract to purchase was executed* the parties intended anything other than relationship imported by the words in the contract. This conclusion is verified by use of a joint tenancy deed signed by the vendors and delivered to their lawyer. It is a fair inference the deed was to be delivered to the vendees when the abstract bill was paid." (Emphasis in original.) 158 N.W.2d at 724.

We reject Ruby's contention the deed had no probative value to overcome the presumption. We believe the fact the contract and deed were drawn simultaneously, apparently by the same scrivener, and as a part of the same transaction render the deed probative as to what decedent and Phyllis intended at the time. With the advantage of that evidence we agree with the trial court's finding the presumption was overcome.

Ruby's second assignment is also without merit.

III. Decedent's partnership with Tamerius began about January 1, 1972. Each owned half interest in the livestock, farm machinery and equipment in the operation. The value of this property was not fixed by the trial court because it held Phyllis had a survivorship interest in it.

After the ancillary estate was opened Phyllis, as co-administrator, sought and obtained permission to continue the operation. She was then of the belief the property was owned by decedent alone. She continued in such a view until after filing of the preliminary inheritance tax report and probate inventory on October 10, 1972. There this one-half property interest was listed on Schedule F as belonging to decedent alone.

The original final report omitted any mention of this property. The amended final report lists it as a part of the assets passing to Phyllis as surviving wife and joint tenant. Phyllis, claiming under what she believes to be Missouri law, asserts it should pass to her as tenant by the entirety. The trial court agreed and Ruby's third proposition challenges this ruling.

■ Ruby argues we should apply Iowa law. In Iowa even where ownership is shared there is a presumption against joint tenancy. *In re Estate of Miller,* supra. The only evidence to establish a joint tenancy or joint ownership at all offered by Phyllis was her statement all purchases for the operation were paid from a joint bank account she maintained with decedent. She argues it is significant the operation took place on a farm held in joint tenancy. See division II of this opinion.

Phyllis argues persuasively we should apply Missouri law. She quotes from *Cook v. Estate of Todd,* 249 Iowa 1274, 1277, 90 N.W.2d 23, 25 (1958):

"The rights of inheritance are statutory. It is generally the rule that the descent of real property is governed by the law of the place where it is situated, while the distribution of personal property is governed by the law of the domicile of the intestate owner at the time of his death. (Authorities)." See also *In re Estate of Colburn,* 186 Iowa 590, 593, 173 N.W. 35, 36 (1919); 15A C.J.S. Conflict of Laws § 18(10), p. 503; 26A C.J.S. Descent & Distribution § 5, pp. 524–526; 23 Am.Jur.2d, Descent and Distribution, § 20, pp. 766–768.

Additionally the parties are at odds over the most significant relationship test in determining which state's law should apply. See *Fabricius v. Horgen,* 257 Iowa 268, 132 N.W.2d 410 (1965); Restatement, Second, Conflict of Laws § 258.

■ These contentions need not be resolved because both parties have overlooked the necessary requirements for showing foreign law. These requirements may be satisfied in the manner specified by statute.

§§ 622.59, 622.60, and 622.61, The Code. Although the specified procedure is not complex it is important because it is mandatory. Foreign law, both statutory and case law, must be pled and proven (though if statutory it may be judicially noted under the procedure specified under rule 94, Rules of Civil Procedure). Upon failure of a party seeking to assert foreign law to do either or both we presume the foreign law to be the same as our own. *Zeman v. Canton State Bank,* 211 N.W.2d 346, 349 (Iowa 1973) and authorities.

■ There was a failure to plead applicable Missouri law in the proceedings below. And there was a wholesale failure to prove it. No evidence was offered, under the statutes or otherwise, to show Missouri law. Citation of Missouri opinions in a trial brief does not, as is urged, qualify because it is not the introduction of evidence. Accordingly we are bound by Iowa law, either because it applies or because we presume Missouri's to be the same.

■ Upon our de novo review we find neither joint ownership nor joint tenancy were shown. Payment for the property from a joint checking account, standing alone, would establish neither. The same is true with regard to the fact decedent and Phyllis filed joint tax returns. See 34 Am. Jur.2d, Federal Taxation, ¶ 5010, page 156.

On the other hand ownership by decedent alone is supported by the record which shows the operation was carried on by decedent and Tamerius with Phyllis knowing little about it. Her application to continue the business in this ancillary estate proceeding and her original listing of the property as decedent's alone are further support.

Trial court erred in holding the personalty in the Tamerius partnership was owned jointly with Phyllis. Decedent's partnership interest was his alone. The case must be remanded for an order directing the value of such property to be established and for it to be probated as part of decedent's estate.

IV. At his death decedent was a service station operator. He owned a station in Bedford, Iowa and leased it to a major oil company. That station is not involved in this appeal.

In addition he owned an interest in an enterprise on the Missouri side of the Iowa-Missouri border. This business included a gas station, liquor store, and restaurant. Half of this business was listed as an asset in decedent's Missouri estate proceedings. The record does not disclose who owned the other half of the business but the checking account for the gas station was maintained as a joint tenancy account of Phyllis and decedent in a Bedford, Iowa bank. Apparently a separate account for the cafe was maintained in a bank in Hopkins, Missouri.

Two months after decedent's death Phyllis withdrew all funds in the gas station account and thereafter used it as the estate account.

As noted decedent died May 12, 1972. Between May 19, 1972 and July 24, 1972, $24,334.65 was deposited in the Bedford bank in the account referred to. Sales and restocking of merchandise continued to be carried out in the same manner as they had during decedent's lifetime. The $24,334.65 deposited resulted from sales of merchandise at the cafe, liquor store and service station.

On July 31, 1972 decedent's interest in the enterprise at the time of his death was appraised in the Missouri estate proceeding at $4587.62. On August 7, 1972 the Missouri probate court set Phyllis's surviving spouse allowance at $7500. It specified the allowance was "to be satisfied by the conveyance of an undivided one-half interest in the inventory, merchandise and stock" located in the cafe and liquor store, previously valued at $4587.62. The balance was ordered paid in cash from the estate.

The deposits of $24,334.65 were not included in either the Missouri or Iowa proceedings. The trial court ruled: " * * * [T]his property was set over to the surviving spouse by the Missouri probate proceed-

ings, and the proceeds therefrom were clearly her property, regardless of where deposited."

Ruby asserts the trial court had jurisdiction over the funds since they were brought into Iowa while an ancillary estate was being administered. She argues this court, under the rule announced in *In re Estate of Hutchison,* 255 Iowa 94, 121 N.W.2d 504 (1963), should direct a distribution in the ancillary administration according to Missouri law. To refuse, she says, would compel Iowa heirs to go to a foreign jurisdiction to have the same assets distributed to them. She asserts she and Lucille would each have received 25 percent of the deposits under Missouri intestate succession laws. No proof was offered to establish Missouri law.

Phyllis contends Iowa could obtain no jurisdiction over the deposits merely because they came into Iowa after decedent's death.

■ We note Iowa probate courts have jurisdiction to administer personal property owned by nonresident decedents and brought into Iowa after death. §§ 633.10 and 633.12, The Code. See also *Liberty v. Kinney,* 242 Iowa 656, 659, 47 N.W.2d 835, 837 (1951); *Christy v. Vest,* 36 Iowa 285, 287 (1873); Restatement, Second, Conflict of Laws § 320; 33 C.J.S. Executors and Administrators § 20f, p. 900.

The authority of an Iowa trial court to distribute known assets under the intestate statutes of a foreign state has long been recognized. *In re Estate of Hutchison,* supra, 255 Iowa at 100–101, 121 N.W.2d at 508, quoting from *In re Estate of Lane,* 199 Iowa 520, 523, 202 N.W. 244, 245 (1925) we said:

" * * * [T]he question whether courts of the * * * ancillary jurisdiction * * will decree distribution of the assets collected under the ancillary administration or remit to the jurisdiction of the domicile, is not one of jurisdiction, but of judicial discretion, dependent upon the circumstances of the particular case. * * *."

■ We decline to order remission of the funds to Missouri in this case. It must be remembered the appraisal figure was fixed as of decedent's death, not the date of appraisal or the date the allowance was fixed for Phyllis. By referring to the value as of that date the Missouri court obviously meant Phyllis was to receive decedent's entire interest in such merchandise. Sales of an inventory of a gas station, liquor store and cafe are to be expected. Phyllis received the right to sell the inventory when it was set off to her by the Missouri court.

At first glance it might seem troublesome to understand how an inventory valued at $4587.62 was able to generate $24,334.65 in sale proceeds in 66 days. However the $4587.62 represented only half of the inventory. We do not know whether the $24,334.65 was 50 or 100 percent of the sales. Neither do we know what inventory turnover was experienced in such businesses.

Upon our de novo review we conclude the trial court ruled properly on Ruby's fourth contention.

V. Ruby's final challenge is to the trial court's allowance of $5000 to Phyllis as surviving spouse. About four weeks after the allowance was made in Iowa the Missouri probate court, as we have noted, allowed Phyllis $7500. Ruby complains there was a double allowance.

Section 633.374, The Code, provides:

"The court shall, upon application, set off and order paid to the surviving spouse, as part of the costs of administration, sufficient of the decedent's property as it deems reasonable for the proper support of the surviving spouse for the period of twelve months following the death of the decedent. * * *. The court shall take into consideration the station in life of the surviving spouse and the assets and condition of the estate. * * *."

■ The purpose of such a statute is to provide for daily necessities of a surviving spouse during the period of readjustment following the death of the breadwinner un-

til such time as final settlement or award is accomplished. 31 Am.Jur.2d, Executors and Administrators, § 324, pp. 161–162.

A separate section provides for the review of the allowance. At the time of the proceedings below § 633.375, The Code, provided: "The court may, upon the petition of the spouse, or other person interested, and after hearing pursuant to notice to all interested parties, review such allowance and increase the same."

We interpreted the effect of § 633.375, The Code, in *In re Estate of DeVries*, 203 N.W.2d 308 (Iowa 1972). In *DeVries* we held as the trial court found below it had no power, in the absence of fraud, collusion, mistake or equitable circumstances justifying vacation of a judgment generally, to decrease the allowance previously made. We note § 633.375, The Code, was amended by Acts of the 66th G.A., 1975 Regular Session, ch. 208, § 11. Under the amendment a trial court would have power to increase or decrease such an allowance. The amendment however was enacted after proceedings below and does not affect this controversy.

For an explanation of a trial court's discretion in fixing such allowances, in the absence of the statutory rule explained in *DeVries,* see *In re Estate of Crouse,* 208 Iowa 333, 223 N.W. 510 (1929).

We believe the allowance here challenged was proper under all circumstances existing when it was made. If an allowance later made in Missouri was thought improper, challenge, if any could be made, should have been made in Missouri. We do not pass upon the question of whether an allowance in an Iowa ancillary proceeding should be affected by an earlier allowance in another state. That question is not presented by the facts before us.

Ruby's final assignment is without merit.

By reason of the matters mentioned in division III hereof the case must be reversed in part and remanded for entry of an order in conformance herewith. In all other respects the judgment of the trial court is affirmed. Costs on appeal are taxed 80 percent to Ruby and 20 percent to Phyllis.

Affirmed in part, reversed in part and remanded with instructions.