No. 98-138

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 303

IN RE ESTATE OF HARRY ALBERT BOLINGER, III,

Deceased.

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Charles F. Angel, Angel Law Firm; Bozeman, Montana

For Respondent:

John Frohnmayer, Attorney at Law; Bozeman, Montana

(for personal representative Deborah Reichman)

Submitted on Briefs: June 25, 1998

Decided: December 8, 1998

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. Hal Bolinger filed a petition for probate of the will of his son, Harry Albert**

Bolinger, III (Bud), in the District Court for the Eighteenth Judicial District in Gallatin County. The decedent's three children, as well as the personal representative who had been appointed prior to the discovery of the will, contested the will and asserted, among other things, that the decedent's estate was entitled to a share of the partnership that they claim Hal had formed with Bud. The District Court concluded that a partnership existed and awarded the estate half of the value of the partnership assets. Hal and his spouse appeal and the estate cross-appeals. We reverse in part and affirm in part the judgment of the District Court and remand this case to the District Court for proceedings consistent with this opinion.

¶2. The parties present eleven issues on appeal:

¶3. 1. Did the District Court err when it ordered the appellants to comply with the estate's discovery requests?

¶4. 2. Did the District Court err when it made findings of fact and granted summary judgment regarding the existence of a partnership between Hal and Bud?

¶5. 3. Did the District Court err when it refused to admit a number of appellants' exhibits?

¶6. 4. Did the District Court err when it denied by summary judgment the existence of an agister's lien?

¶7. 5. Did the District Court err when it awarded one-half of the market value of the ranch equipment and cattle to the estate?

¶8. 6. Did the District Court err when it refused to hold the estate accountable for the value of any of the losses from the ranch?

¶9. 7. Did the District Court err when it awarded the estate a $9000 credit based on Hal's denial of the estate's attempts to cut and remove hay from the decedent's land?

¶10. 8. Did the District Court err when it awarded the estate a $40,500 credit based on Hal's denial of the estate's attempts to use certain pasture land?

¶11. 9. Did the District Court err when it determined that the judgment constituted a

lien against all the personal property of the partnership?

¶12. 10. Did the District Court err when it refused to recognize the real property of the ranch as an asset of the partnership?

¶13. 11. Is the estate entitled to attorney fees and costs?

## FACTUAL BACKGROUND

¶14. Harry Albert Bolinger, III (Bud) died March 25, 1995. He was survived by his three adult children, as well as his father and stepmother. Intestacy proceedings were initiated, and in April 1995 Deborah Reichman became personal representative of the estate.

¶15. On July 13, 1995, H.A. Bolinger (Hal), Bud's father, submitted a will for probate and petitioned the District Court for appointment as personal representative. The will, which was prepared in 1984, left all of Bud's estate to Hal and nominated him as the personal representative. In the event that Hal failed to survive Bud, the will named Marian Bolinger, Hal's wife, as the sole beneficiary. On November 1, 1995, Hal withdrew his request to be appointed personal representative and suggested that Marian, who was also nominated by the will, be named personal representative.

¶16. This Court discussed the terms of the will in *In re Estate of Bolinger* (1997), 284 Mont. 114, 943 P.2d 981. In dispute was whether the language of the will created an express trust for the benefit of Bud's three children. We ultimately held that it did not.

¶17. Pursuant to the will contest, the estate filed discovery requests and moved for partial summary judgment. Hal and Marian objected to some of the requests that related to taxes and assets of the ranch, and the existence of a partnership between Hal and Bud on the basis that they were not relevant to the issue of the will's validity. In December 1996, the District Court overruled their objections and ordered that they answer the requests and allow an inspection of the ranch by the end of January 1997.

¶18. After a hearing, and based on all the evidence before it, on December 18, 1996, the District Court made findings of fact and conclusions of law in response to the

summary judgment motion. It stated that "[i]n the interest of judicial economy, the Court feels it advisable to make detailed findings at this time, to assist in determining other issues which may hereafter need to be determined." Most of the District Court's findings and conclusions pertained to the terms of the will, but in addition, the District Court found that Hal and Bud had entered into a written partnership agreement in 1968. It found that despite the express ten-year term of the agreement, Hal and Bud operated the ranch as a partnership until Bud's death. In addition, it found that Hal had filed a $49,000 claim against the estate, based on an agister's lien claim, to recover for his expenses incurred to feed Bud's cattle from January 1, 1994, to May 15, 1995; Reichman denied the claim in June 1995 prior to the discovery of the will. It went on to find that there were no written documents regarding the terms of the alleged agreement, and that Marian, the only witness to Hal and Bud's agreement, had described the extent of the agreement as a statement by Hal and subsequent acknowledgment by Bud that he would "have to pay his share."

¶19. Based on the District Court's findings, the estate made a second motion for partial summary judgment in January 1997. It contended that the findings established the existence of a partnership and that the District Court should order an accounting of the partnership. Furthermore, it contended that the agister's lien should be denied in its entirety as a matter of law, based on a lack of specificity in the alleged agreement between Hal and Bud. In response, Hal and Marian contended that their affidavits established genuine issues of fact regarding the lien which precluded summary judgment, and that summary judgment regarding the existence of a partnership must be denied for the same reason.

¶20. On February 25, 1997, the District Court concluded that the alleged agreement between Hal and Bud, which was the basis of Hal's claimed agister's lien, was not specific and, therefore, was unenforceable as a matter of law. The District Court also concluded, based on Hal's testimony, that a partnership existed. Accordingly, it granted the motion for partial summary judgment and ordered that an accounting be performed.

¶21. The accounting was eventually performed and considered by the District Court at a hearing in May 1997. On September 3, 1997, the District Court issued its findings of fact, conclusions of law, and judgment pursuant to the accounting, in which it determined the amount of ranch property that should be credited to the estate. Based on its interpretation of the partnership agreement, the District Court

concluded that the land on which the partnership operation was conducted was never intended to be an asset of the partnership and excluded its value from the determination of the estate's interest. The division and valuation of the remaining partnership assets relied, in large part, on the fact that Hal and Marian had refused to respond to Reichman's discovery requests and the District Court's subsequent orders to compel, so that they were estopped from contesting the values or division arrived at by the District Court.

¶22. The judgment awarded Bud's estate included one-half the market value of the partnership cattle and equipment, and compensation for lost use of pasture land and hay taken from Bud's land, for a total of approximately $225,000. Finally, the District Court held that the judgment constituted a lien against all personal property of the partnership.

ISSUE 1

¶23. Did the District Court err when it ordered the appellants to comply with the estate's discovery requests?

¶24. We review a district court's ruling on discovery matters to determine whether the district court abused its discretion. *See McKamey v. State* (1994), 268 Mont. 137, 145, 885 P.2d 515, 520; *In re Marriage of Caras* (1994), 263 Mont. 377, 384, 868 P.2d 615, 619. We stated in *Massaro v. Dunham* (1979), 184 Mont. 400, 404-05, 603 P.2d 249, 251-52, that a district court has inherent discretionary power to control discovery, and that we will reverse its discovery decisions only when the substantial rights of a party have been materially affected such that there exists the possibility of a miscarriage of justice.

¶25. Appellants concede that the District Court has discretionary authority to control discovery, but rely solely on their assertion that "such discretionary power is not unfettered." They imply that the District Court abused its discretion when it did not hold a hearing to address their objections.

¶26. We note from our review of the record that the discovery about which appellants now complain had been the subject of a previous order by the District Court and that prior to the order complained of on appeal, appellants did in fact have an opportunity to raise their objections at a hearing before the District Court.

For these reasons, we conclude that the appellants' substantial rights have not been affected by the District Court's order to compel discovery.

ISSUE 2

¶27. Did the District Court err when it made findings of fact and granted summary judgment regarding the existence of a partnership between Hal and Bud?

¶28. The question of whether a partnership exists constitutes a mixed question of fact and law. *See Blocker Exploration Co. v. Frontier Exploration, Inc.* (Colo. 1987), 740 P.2d 983, 988. Courts must decide as a matter of law what constitutes a partnership, but the determination of whether the evidence in a given case supports the existence of a partnership is a question of fact. *See Simons v. Northern Pac. Ry. Co.* (1933), 94 Mont. 355, 369, 22 P.2d 609, 614; *see also Blocker Exploration*, 740 P.2d at 988; *Pruitt v. Fetty* (W. Va. 1964), 134 S.E.2d 713, 716. "However, where the facts are undisputed, or susceptible of only one inference, the question as to whether a partnership exists between particular persons is one of law for the court." *Pruitt*, 134 S.E.2d at 716.

¶29. We review a district court's findings of fact to determine whether they are clearly erroneous. *See Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906. We review a district court's conclusions of law to determine whether its interpretation is correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

¶30. Appellants contend first that the District Court erred when it even addressed the existence of a partnership pursuant to the will contest and without requiring Reichman to initiate a separate action against Hal to determine his rights. Among other claims, they contend that the absence of a separate action denied Hal a fair opportunity to contest the claimed partnership. We disagree.

¶31. We have held that it is entirely appropriate and necessary for a district court to make findings of fact on those matters for which there is evidence in the record and to determine the issues as raised by the parties' pleadings. *See Watkins v. Williams* (1994), 265 Mont. 306, 314-15, 877 P.2d 19, 24; *Heller v. Osburnsen* (1973), 162 Mont. 182, 188-89, 510 P.2d 13, 16-17; *see also In re LaBelle* (Wash. 1986), 728 P.2d 138, 152. Here, the children's and estate's objection to probate of Hal's proffered will

expressly raised the existence of a partnership between Hal and Bud as a potential barrier and put the matter before the District Court. Furthermore, the District Court's fundamental authority in this matter pertains to the administration of the estate and, as such, a determination of the property interests that Bud owned was essential to a final resolution.

¶32. The District Court noted in its order that its December 18, 1996, findings were motivated in part by judicial economy, and the question of a partnership, even if not the single focus of the particular hearing to which appellants refer, was ultimately a necessary part of this case. Appellants' claim that they were denied the opportunity to contest the claim of a partnership is contradicted by the subsequent occasion they had to brief and argue at the February 1997 hearing regarding partnership issues. Moreover, they present no authority for their position that a separate action was required. Accordingly, we conclude that the District Court did not err when it addressed the existence of a partnership.

¶33. Appellants also contend that the District Court erred in substance when it found that the ranch operation constituted a partnership, and eventually ordered an accounting pursuant to the estate's motion for summary judgment.

¶34. We most recently discussed the elements of a partnership in *MacArthur Co. v. Stein* (1997), 282 Mont. 85, 934 P.2d 214. Section 35-10-202(2), MCA, generally defines a partnership as "the association of two or more persons to carry on as co-owners a business for profit . . . whether or not the persons intend to create a partnership." A partnership exists where: (1) the parties clearly manifest their intent to form a partnership; (2) each party contributes something to promote the partnership; (3) each party has a right of mutual control over the subject of the partnership; and (4) there is an agreement among the parties to share the profits of the enterprise. *See Bender v. Bender* (1965), 144 Mont. 470, 480, 397 P.2d 957, 962. All four requirements must be established to prove the existence of a partnership. *See MacArthur*, 282 Mont. at 89, 934 P.2d at 217; *Weingart v. C & W Taylor Partnership* (1991), 248 Mont. 76, 79-80, 809 P.2d 576, 578.

¶35. Here, Hal and Bud executed a written partnership agreement in 1968. The agreement set forth the parties' relationship and their rights and duties in satisfaction of each of the four elements. Most importantly, the terms and title of the agreement as a whole clearly establish that they intended to operate the ranch as a

partnership. Appellants apparently contend that in spite of the agreement, Hal and Bud were never formal partners, even during the ten-year duration of the agreement. They rely on tax records and testimony that referred to the ranch as Hal's and to Bud as Hal's "hired man." Their position, however, ignores the effect of Hal's own testimony.

¶36. The following excerpt from Hal's deposition established his intent with regard to his and Bud's relationship:

Q. [Y]ou and Bud sort of worked together on the ranch. Am I correct in that?

A. Yeah. As long as he was there, why, that's right.

Q. And did you make the decisions together, in terms of what you do on the ranch, what kind of cattle you'd run, that sort of thing?

A. Everything was agreeable, anything between the two of us, I think. I don't recall any-- anything else to it. We have cattle, and that's it.

Q. And that sounds like a partnership. Is that how you would characterize it?

A. A partnership?

Q. Yes.

A. I think that would be right. Whatever--whatever is done, we probably talked to each other as to why we were doing it.

Q. And is that pretty much the way it was from the time Bud started living there on the ranch to the time that he died?

A. I think that would be correct. Things changed some. I guess that's about as close as we can come.

. . . .

Q. This partnership agreement was for the running of your ranch, wasn't it?

A. I think that's--yes. That's what we were trying to do, is operate with it that way, I guess.

Q. Now, this was for a partnership for a term. It was for ten years, according to the document. Do you--did you just go on after that ten years and keep kind of doing the same thing?

A. I don't remember any ten years looking at it or working with it or talking with each other about it.

Q. You just sort of did the same thing from beginning to end?

A. That's right.

**¶37. We conclude, based on the record before us and the law applicable to**

partnerships, that there was no material issue of fact regarding the ranch's operation as a partnership.

¶38. The District Court aptly characterized the nature and full extent of the evidence that appellants offered in response to the summary judgment motion as mere statements "that none of the affiants heard that Buddy Bolinger was a partner with H.A. Bolinger in the operation of the ranch." Regardless of how Hal referred to the ranch operation in his tax returns, the partnership agreement, together with the unchallenged fact that Hal and Bud did not change their relationship or operation after the expiration of the agreement, permit only one conclusion. Accordingly, we conclude that a partnership existed, and we affirm the District Court's decision granting judgment to the estate as a matter of law on that issue.

## ISSUE 3

¶39. Did the District Court err when it refused to admit a number of appellants' exhibits?

¶40. We review the evidentiary rulings of a district court to determine whether it abused its discretion. A district court has broad discretion to determine if evidence will be admitted and absent an abuse of that discretion we will not overturn a district court's determination. *See In re Marriage of Meeks* (1996), 276 Mont. 237, 249, 915 P.2d 831, 838.

¶41. Appellants attempted at the accounting hearing, after the District Court had already conclusively determined that the ranch constituted a partnership, to offer a number of exhibits as evidence that the ranch was in fact not operated as a partnership. The District Court refused to admit those exhibits and appellants assert here that it erred by doing so.

¶42. With the exception of one exhibit, appellants make no claim that their failure to present the evidence prior to summary judgment was for any legitimate reason. They made no request for an extension of time when the District Court was considering the issue of whether the ranch constituted a partnership, nor do they suggest now that the exhibits became available only after the District Court's initial decision. We have held that when a party has had sufficient opportunity to present evidence during the summary judgment process, a district court does not necessarily have to consider the

evidence and revisit the merits of the claim. *See State Med. Oxygen & Supply, Inc. v. American Med. Oxygen Co.* (1994), 267 Mont. 340, 883 P.2d 1241. Accordingly, we conclude that the District Court did not abuse its discretion when it refused to admit evidence related to the partnership issue after it had been decided.

## ISSUE 4

¶43. Did the District Court err when it denied by summary judgment the existence of an agister's lien?

¶44. When the facts are not in dispute, whether an oral contract exists constitutes a question of law which shall be reviewed to determine whether the district court's interpretation of the law is correct. *See Reese v. Forsythe Mergers Group, Inc.* (Ill. Ct. App. 1997), 682 N.E.2d 208, 213; *see also Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp.* (Iowa Ct. App. 1995), 535 N.W.2d 149; *Herm Hughes & Sons, Inc. v. Quintek* (Utah Ct. App. 1992), 834 P.2d 582. The parties' only dispute here is whether the alleged language of the agreement created an enforceable contract.

¶45. The agister's lien at issue is based on an agreement allegedly made by Hal and Bud during a conversation in January 1994. Marian, who was present during their conversation regarding the cattle that Hal had just gifted to Bud, testified in her deposition that the entire oral agreement was the statement from Hal--"Buddy, you understand you have to pay your share"--and Bud's response--"Of course." The District Court relied on the lack of a specific response from Bud, the uncertainty of the agreement, and on the lack of any specific terms by which to interpret the agreement as the basis for summary judgment in favor of the estate on this issue.

¶46. On appeal, appellants point out that pursuant to § 71-3-201(1), MCA, an agister's lien can be founded on an express or implied contract. They also assert that based on *Heckman & Shell v. Wilson* (1971), 158 Mont. 47, 57, 487 P.2d 1141, 1146, the lien is valid despite the lack of a specific, agreed-upon price, and can be enforced for a "reasonable value of the services rendered." The estate contends that the agreement here is indistinguishable from the agreement that we held too uncertain to constitute a contract in *Bishop v. Hendrickson* (1985), 215 Mont. 158, 695 P.2d 1313. In *Bishop*, one lawyer in a partnership tried to enforce against his partner their agreement that "there would be a place . . . in the law firm" for any of their children who became lawyers and wanted to practice with the firm. We held that the

agreement left too many details unaddressed, and that it was too uncertain to be enforceable as a contract.

¶47. While we acknowledge appellants' contention that pursuant to *Wilson* an agister's lien may be enforceable without further specification in the underlying agreement regarding the price for the services, we conclude here that the conversation between Hal and Bud is too vague as a matter of law to establish an enforceable contract. For example, we effectively held in *Somont Oil Co. v. Nutter* (1987), 228 Mont. 467, 472, 743 P.2d 1016, 1019, that, at a minimum, the material elements of a contract must be present in general terms. Not only are those material terms missing here, but as we also discussed in *Bishop*, the agreement between Hal and Bud creates even more questions about the parties' expectations than it does purported certainties about their alleged obligations to perform. Accordingly, we conclude that the agreement on which appellants rely for their claim of an agister's lien against the estate is unenforceable, and we affirm the District Court's denial of the lien by summary judgment.

## ISSUE 5

¶48. Did the District Court err when it awarded one-half of the market value of the ranch equipment and cattle to the estate?

¶49. Appellants contend that the 1968 partnership agreement established the value of the partnership and that the terms of the agreement should govern the amount to which the estate is entitled. They assert that the District Court erred when it did not follow the terms of the agreement but instead awarded the estate one-half of the market value of the partnership property.

¶50. Montana law provides that when a partnership agreement exists, it controls the rights and duties of partners. *See* § 35-10-106, MCA. Moreover, when partners continue a partnership beyond the expiration of the partnership agreement, their rights and duties remain the same as they were at the expiration of the agreement, effectively extending the force of the agreement to the partnership for as long as the partners continue the business or until they modify the agreement. *See* § 35-10-406, MCA.

¶51. The partners' right to control their relationship via the agreement, and in

particular to restrict the value of their respective shares upon death or dissolution, is so well-established that courts will enforce a value in the agreement even if the value to which a partner is entitled is substantially lower than the actual market or book value of his share. *See G & S Investments v. Belman* (Ariz. Ct. App. 1984), 700 P.2d 1358, 1367; *In re Estate of Johnson* (Ill. Ct. App. 1984), 472 N.E.2d 72, 74-75. For such a limitation to be valid, however, the partners must have explicitly agreed to a value of their potential share at something other than fair market value. *See Anderson v. Wadena Silo Co.* (Minn. 1976), 246 N.W.2d 45, 46-48; *Bohn v. Johnson* (N.D. 1985), 371 N.W.2d 781, 788-89; *Bohn v. Bohn Implement Co.* (N.D. 1982), 325 N.W.2d 281, 285.

¶52. Here, the agreement establishes a value ($47,790.30) for the partnership and states that that value shall control in the event of a sale or dissolution of the partnership. The terms also state that the partners shall, for the duration of the agreement, arrive annually at a new and updated value, which will serve for the following year as the value of the partnership. In the event of Hal's or Bud's death, the agreement gives the surviving partner the right to purchase the deceased partner's interest at the value established in the agreement, with one-fourth of the purchase price due within six months of the death. However, the terms set forth were not followed.

¶53. First, Hal and Bud did not reestablish a different value for the partnership as contemplated in the agreement. Therefore, the only value established by the partnership is the original 1968 amount of $47,790.30, an amount which neither of the parties suggests reflects its present value. Second, Hal has made no effort to purchase Bud's interest in the partnership.

¶54. A partnership agreement is essentially a contract between the partners and, therefore, is to be interpreted and applied in accordance with principles of contract law. *See Argianas v. Chestler* (Ill. Ct. App. 1994), 631 N.E.2d 1359, 1368; *Klein v. Weiss* (Md. 1978), 395 A.2d 126, 141. Where language in a contract is clear and unambiguous, it is a court's duty to simply apply the language. *See Molerway Freight Lines, Inc. v. Rite-Line Transp. Serv., Inc.* (1995), 273 Mont. 95, 100, 902 P.2d 9, 12; *Carbon County v. Dain Bosworth, Inc.* (1994), 265 Mont. 75, 87, 874 P.2d 718, 726. On the one hand, the contract is absolutely clear and unambiguous as to what the parties intended regarding the partnership's valuation and, likewise, as to what that value was at the time that they entered the agreement. This issue turns, however, on the

fact that the parties' failure to comply with the agreement and to reassess the value of the partnership conflicts with their expression of intent and creates now a manifest ambiguity as to the value of the partnership thirty years after its creation.

¶55. Other courts have had to interpret and apply ambiguous partnership agreements similar to the one here when partners failed to establish a value for partnership property. In each case, the court held that fair market value at the time of the partner's death should apply. *See Curtis v. Campbell* (Ky. Ct. App. 1960), 336 S. W.2d 355; *Anderson*, 246 N.W.2d 45; *Chapman v. Dunnegan* (Mo. Ct. App. 1984), 665 S.W.2d 643; *Bohn Implement Co.*, 325 N.W.2d 281.

¶56. *Chapman* involved facts very similar to this case. The partnership agreement called for the partners to value the real estate owned by the partnership on an annual basis; additional language which is not present in Hal's and Bud's agreement stated that if in a given year the partners failed to value the property, the previous year's value stood. Like here, however, the partners failed to follow the terms of the agreement and never established a value for the property. The estate urged that a fair market value should be assigned to the property, while the remaining partners contended that its book value should control. The court provided the following analysis:

The partners' failure to comply with the expressed method for valuing partnership real estate was, in effect, an abandonment of that method and left the partnership agreement without a provision for valuing partnership real estate. In the absence of a provision in the partnership agreement, the relevant provisions of the [statute] . . . are persuasive. [The statute] provides that the legal representatives of a deceased partner shall receive "an amount equal to the value of his interest in the dissolved partnership" at the time of dissolution. . . . The prevailing view among [other] courts is that, upon the dissolution of a partnership by death, fair market value must be used to evaluate the deceased partner's interest if the partnership agreement does not specify the method of valuing partnership assets or the method provided was not complied with.

The rationale for this view is not difficult to understand. . . . [A] fair market value represents the real value of the partnership holdings--the value that the partners would receive if they sold the business. At common law, when a partner died or retired, surviving partners were required to liquidate the business and distribute the proceeds. The Uniform Partnership Act permits the surviving partners to continue the business, but requires them

to pay to the decedent's legal representatives the value of the decedent's interest. . . . Measuring "the value of his interest" at its actual fair market value, when no other method is expressed, is the only sensible method to preserve the estate's right to the decedent's fair share.

*Chapman*, 665 S.W.2d at 649-50 (citations omitted).

**¶57. Appellants contend that insofar as the agreement here establishes a value, it has more force and is thus distinguishable from the agreements in the cases above which either did not establish a value or referred only to an imprecise valuation term. As in *Chapman*, however, Hal and Bud essentially abandoned their method of valuation, the effect of which was to abandon whatever explicit agreement they reached regarding the 1968 valuation and its potential ability to serve as (i.e., limit) the value for the partnership in subsequent years. It was clearly not their intent that the 1968 figure would serve as the value in future years, nor should we now default to that value simply because they failed to establish a new one. Rather, like in *Chapman*, we are guided by the statute, which suggests that upon dissociation a partner is entitled to the greater of either the liquidation value or the fair market value at the date of dissociation. *See* § 35-10-619(2), MCA. While the statute is not directly applicable here, we note the policy reflected therein and we agree with the court's rationale in *Chapman* and its conclusion that fair market value at the time of a partner's death should apply when partners have failed to comply with the terms of their agreement and are thus left without an explicitly agreed upon value for the partnership. Accordingly, we affirm the District Court's award to the estate of fair market value for the partnership assets.**

## ISSUE 6

**¶58. Did the District Court err when it refused to hold the estate accountable for the value of any of the losses from the ranch?**

**¶59. Appellants contend that for purposes of a final settlement, half of the losses suffered by the partnership should be assigned to the estate. They contend that because the losses for which the estate is allegedly responsible are greater than the assets to which it is entitled, nothing is owed to the estate from the partnership.**

**¶60. The District Court found that "Hal took the tax benefit of all the [partnership]**

losses and . . . cannot now claim that any loss should be attributed to Bud." It concluded that in addition to the benefit from the losses "he must also bear the burden," and, therefore, that he is effectively precluded from trying to assign a share of the losses to the estate. In response to the District Court's conclusion, appellants distinguish between Hal having claimed the losses on his income tax returns and having assumed total responsibility for the losses.

¶61. It is well-established that partners can agree to the precise division of partnership profits and losses. *See* § 35-10-106, MCA; *see also Walsh v. Chestnut Hill Bank & Trust Co.* (Mass. 1993), 607 N.E.2d 737, 743; *Smith v. Daub* (Neb. 1985), 365 N.W.2d 816, 820; *Bucholtz, P.C. v. Computer Based Sys., Inc.* (Va. 1998), 498 S.E.2d 231, 233. An agreement not to share losses (or profits) equally need not be made expressly, but may be implied from the partners' conduct. *See Daub*, 365 N.W.2d at 820. We may also infer in part from the nature of the partnership whether the partners intended to share losses. *See Devereaux v. Cockerline* (Or. 1946), 170 P.2d 727. For example, in *Devereaux*, the court found it "improbable" that either party would have contemplated that they would share losses as a result of their investment, based on the fact that the more affluent partner contributed the capital and the other partner's contribution consisted of his time and energy toward the business. *See Devereaux*, 170 P.2d at 733-34.

¶62. It is not disputed that Hal claimed all of the partnership's losses on his personal taxes for the purpose of receiving a tax benefit, or that Hal and Bud were equal partners. The only contested issue is what effect, if any, Hal's acceptance of the annual losses has on Hal's and Bud's capital interests during an accounting of the partnership. Neither party provides any authority for their position, and the extent of the District Court's support for its conclusion is the principle that he who receives the benefit of an act must also bear its burden. We conclude that under the circumstances in this case, the District Court was correct when it held that a partner is bound, at least in part, by his treatment of partnership liabilities.

¶63. Section 704(a) of the Internal Revenue Code permits partners to allocate amongst themselves their respective share of partnership income and losses. Section 704(b) also provides that the IRS will respect an allocation for tax purposes only if the allocation meets certain conditions, including that the allocation have "substantial economic effect." Generally, that means that an allocation must be consistent with the partners' basic economic interests in the partnership in order to

be recognized by the IRS. *See Orrisch v. Commissioner* (T.C. 1970), 55 T.C. 395, *aff'd per curiam* (9th Cir. 1973) (unpublished decision). "[I]n the event there is an economic benefit or economic burden that corresponds to an allocation, the partner to whom the allocation is made must receive such economic benefit or bear such economic burden." Treas. Reg. § 1.704-1(b)(2)(ii). Consequently, an allocation will have substantial economic effect, and thus be respected by the IRS, only if the partners' ultimate equity interests in the partnership, regardless of tax consequences, are affected. *See* Treas. Reg. § 1.704-1(b)(2)(iii)(a).

¶64. Internal Revenue Code § 704(b) compels that we rely on Hal's conduct throughout the life of the partnership and on the fact that the IRS recognized Hal's personal tax claims to 100% of the partnership losses, from which it follows that Hal's returns conclusively establish his responsibility for 100% of the losses.

¶65. We conclude that the intent of the parties was evidenced by both the fact that Hal did not attempt to assign any of the losses to Bud and by the general nature of their relationship, to which Bud contributed primarily his energy and Hal his capital.

¶66. More generally, we hold that where partners have exercised their right to allot partnership losses in some fashion other than in equal proportion to their division of profits, that division of losses shall control for purposes of determining responsibility for the losses during settlement. Accordingly, we conclude that the District Court did not err when it refused to allocate any of the partnership losses to the estate and thus refused to diminish the value of its interest in the partnership.

ISSUE 7

¶67. Did the District Court err when it awarded the estate a $9000 credit based on Hal's denial of Reichman's attempts to cut and remove hay from the deceased's land?

¶68. Appellants assert here that the District Court should not have considered the estate's claim against appellants for the alleged removal of hay from Bud's land. They contend that the issue was beyond the scope of the accounting hearing because the estate's interference claim was not specifically listed in the pretrial order.

¶69. The funds in dispute involve hay grown on Bud's land. Due to a misplaced fence

that separated their land from Bud's, appellants used the land and received two hay crops which the District Court found to have a value of $4500 each. Appellants do not contest any of the following findings, all of which are supported by our review of the record: (1) that the fence is not on the boundary; (2) that they were on notice from Reichman in July 1995 regarding the misplacement of the fence; and (3) that the hay had a value of $9000. Their only allegation is that the District Court erred when it considered the claim at the accounting hearing and made subsequent findings and an award as a result.

¶70. As we stated above, the District Court has the authority and the responsibility to address matters raised by the pleadings. Here, the pretrial order lists among the estate's contentions the misplaced fence. As such, appellants should have been aware that the hay proceeds were an issue, and that it was within the District Court's authority to resolve it and all other matters regarding the estate's financial interest in all income derived from both Bud's property and the partnership land. Their only objection to the matter came in closing argument at the end of the hearing when they alleged that the estate's claim "goes way beyond" the contentions in the pretrial order. Although the appellants claim lack of notice, they made no request for an extension of time in which to address the claim. In addition, they have not challenged the merits of the District Court's findings. Accordingly, we affirm the District Court.

## ISSUE 8

¶71. Did the District Court err when it awarded the estate a $40,500 credit based on Hal's denial of the estate's attempts to use certain pasture land?

¶72. Appellants make the same argument that they made regarding the hay proceeds. The facts involve a pasture lease which Reichman alleges appellants wrongfully prevented the estate from using in 1995. Due to its inability to use the pasture, the estate was forced to sell cattle prematurely, which the District Court found resulted in a loss of $40,500. Once again, there is evidence in the record to support the District Court's findings, no challenge has been made to the findings, and appellants apparently claim only that this matter should have been decided at a later time.

¶73. Our review shows that the pasture lease was specifically mentioned in the pretrial order, albeit as an ancillary issue. We further recognize that, like their

response to the hay proceeds claim, appellants made only a vague objection at closing argument to the estate's claim regarding the pasture lease. Accordingly, for the reasons stated previously, we affirm the District Court.

## ISSUE 9

¶74. Did the District Court err when it determined that the judgment constituted a lien against all the personal property of the partnership?

¶75. The District Court stated that its judgment "constitutes a lien against all personal property of the Partnership." Appellants assert that based on § 25-9-301(2), MCA, the District Court lacked authority to create a lien against personal property. Rather, they contend that a judgment cannot become a lien against personal property until there has been an execution to enforce the judgment. The estate's only response is that the District Court has equitable power to control the partnership's assets.

¶76. Contrary to the estate's position, however, there is no authority for a district court to summarily convert a judgment to a lien against personal property. Section 25-9-301(2), MCA, states that "[f]rom the time the judgment is docketed, it becomes a lien upon all real property of the judgment debtor." With regard to personal property, which, unlike real property, is not referred to in the statute as subject to a lien immediately when a judgment is docketed, a lien does not arise prior to execution on that property. For these reasons, we reverse the District Court's creation of a lien against the personal property of the ranch.

## ISSUE 10

¶77. Did the District Court err when it refused to recognize the real property of the ranch as an asset of the partnership?

¶78. The District Court concluded that "[i]t was never intended by the [partners] that the land referred to in the Agreement should become an asset of the partnership to be distributed or taken into account on the dissolution of the partnership or death of a partner." On that basis, it concluded that the partnership did not own the land and consequently made no award to the estate based upon its interest in the real property.

¶79. On cross-appeal, the estate contends that it is entitled to a share of the value of the real property. In reliance on § 35-10-203, MCA, it asserts that the land was acquired with partnership assets and therefore became partnership property. In the alternative, it asserts that because equitable principles require the inclusion of the land among the partnership assets, a resulting trust is created for the estate's benefit. Appellants contend in response that the partnership agreement clearly reflects the partners' intent to preserve the real property as solely Hal's property and not to transfer ownership to the partnership.

¶80. Section 35-10-203(4), MCA, states:

Property is presumed to be partnership property if purchased with partnership assets even if not acquired in the name of the partnership or of one or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership.

As reflected in the statute, property is merely presumed to become property of the partnership if it is acquired with partnership assets. The presumption is rebuttable and may be overcome. *See Mehl v. Mehl* (1990), 241 Mont. 310, 314, 786 P.2d 1173, 1176; *In re Perry's Estate* (1948), 121 Mont. 280, 287-88, 192 P.2d 532, 536.

¶81. Whether property belongs to the partnership depends primarily on the intent of the partners. *See Mehl*, 241 Mont. at 314, 786 P.2d at 1175; *Perry's Estate*, 121 Mont. at 287, 192 P.2d 532, 536; *see also Norman v. Bozeman* (Ala. 1992), 605 So. 2d 1210, 1213; *Shumway v. Shumway* (Idaho 1984), 679 P.2d 1133, 1139; *Matter of Allen's Estate* (Iowa 1976), 239 N.W.2d 163, 166; *Stafford v. McCarthy* (Mo. Ct. App. 1992), 825 S.W.2d 650, 656-57; *Mischke v. Mischke* (Neb. 1995), 530 N.W.2d 235, 240; *Bassett v. Bassett* (N.M. 1990), 798 P.2d 160, 166-67; *Eckert v. Eckert* (N.D. 1988), 425 N.W.2d 914, 916; *Gorger v. Gorger* (Or. 1976), 555 P.2d 1, 9; *In re Rider's Estate* (Pa. 1979), 409 A.2d 397, 400; *In re Schaefer's Estate* (Wis. 1976), 241 N.W.2d 607, 609-10. The partners' intent may be inferred from a variety of sources, such as their agreement and their conduct, although no single factor is determinative. *See Stafford*, 825 S.W.2d at 656-57; *Perry's Estate*, 121 Mont. at 287-88, 192 P.2d 532, 536; *Bachand v. Walker* (S.D. 1990), 455 N.W.2d 851, 855.

¶82. Here, the District Court relied primarily on the partnership agreement when it concluded that the partners did not intend that the land become partnership

No

**property. The agreement stated in relevant part:**

[Hal] will contribute said lands for the use of said partnership and that in consideration thereof said partnership will make the annual payments due on a mortgage indebtedness owing against said lands . . . and will pay the cost of any necessary repairs or improvements in connection with said lands and all taxes levied against said lands during the term of this agreement.

The agreement also stated that Hal, in whose name title has always been held, reserved "the right to sell any or all of said lands," as well as the right to live in the home on the ranch.

**¶83. The language of the agreement states that Hal contributed the land for use, and not outright as an asset of the partnership, as evidenced further by his reservation of the right to sell the land. His reserved right to live on the land also indicates that the parties had no intention of turning ownership of the land over to the partnership.**

**¶84. The District Court found that over $700,000 had been paid by the partnership for the use of the land, and it is that payment of funds on which the estate relies for its alleged interest in the land. As suggested above, payment of partnership funds does not by itself cause property to become an asset of the partnership. Nor is use by the partnership sufficient in and of itself to convert a partner's property into property of the partnership.** *See Norman*, **605 So. 2d at 1213;** *Gertz v. Fontecchio* **(Mich. 1951), 49 N.W.2d 121, 124-24;** *Mischke*, **530 N.W.2d at 240. In fact, it is not unusual for property to be used for partnership purposes although it does not belong to the partnership.** *See Ellis v. Mihelis* **(Cal. 1963), 384 P.2d 7, 14.**

**¶85. The estate offers no authority by which we might conclude that payments made by the partnership in consideration for use of land necessarily establish an intent on behalf of the partners that the property become a partnership asset, or that such payments necessarily alter the nature of ownership in the property. We look instead to the partners' intent, which in this case indicates clearly that Hal would retain ownership of the land.**

**¶86. Accordingly, we conclude that the District Court did not err when it refused to award the estate a share of the value of the land.**

# ISSUE 11

**¶87. Is Reichman entitled to attorney fees and costs?**

**¶88. Although fees and costs were claimed by the estate, and objections were filed by the appellants, the District Court had not addressed those claims prior to the filing of appellants' notice of appeal. Since these issues are best resolved, in the first instance, by the trial court, we remand for resolution of those claims.**

**¶89. The judgment of the District Court is affirmed in part, reversed in part, and this case is remanded to the District Court for further proceedings consistent with this opinion.**

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ WILLIAM E. HUNT, SR.